JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

SEP 3 0 2003

FILED
CLERK'S OFFICE

**MDL 1578**



# BEFORE THE JUDICIAL PANEL
# ON MULTIDISTRICT LITIGATION

|  |  |  |
|---|---|---|
| IN RE ASSOCIATION-GROUP INSURANCE LITIGATION | : : : : : | **MDL DOCKET NO. _____** |

## MOTION FOR TRANSFER AND CONSOLIDATION
## IN THE NORTHERN DISTRICT OF TEXAS

Pursuant to 28 U.S.C. § 1407 and Rule 7.2 of the Rules of Procedure of the

Judicial Panel on Multidistrict Litigation (the "MDL Panel"), movants UICI, Mid-West

National Life Insurance Company of Tennessee ("Midwest"), and The MEGA Life and

Health Insurance Company ("MEGA"), (collectively, the "Movants") respectfully submit

this motion to transfer the eleven federal actions described in the attached Schedule of

Actions to the Northern District of Texas, Dallas Division, for coordinated or

consolidated pre-trial proceedings. In support of this motion, Movants allege as follows:

1.      Eleven Similar Actions Are Pending in the Federal Courts. Eleven federal

actions (the "Actions") that all arise from the relationship between the Movants and

certain associations are currently pending in six separate districts and four different

states. These actions are listed in the Schedule of Actions, which is attached hereto as

Attachment "A."

OFFICIAL FILE COPY   IMAGED OCT 2 '03

2.      <u>Common Questions of Fact Exist</u>.  All of the Actions involve common

questions of law and fact.  Generally, the complaints in these Actions allege that the

Movants (UICI, MEGA, and Mid-West) engaged in a nationwide scheme to sell health

insurance to individual consumers and small business owners by fraudulently concealing

alleged relationships between UICI, Mid-West, and MEGA and two not-for-profit

associations, the Alliance for Affordable Services (the "Alliance") and the National

Association for the Self Employed (the "NASE").  Development of the intricate facts

common to the Actions – including the alleged interrelationship between the Movants,

the NASE, and the Alliance – will be sought by the Plaintiffs in the Actions.  Further,

anticipated discovery requests regarding these alleged interrelationships are likely to

significantly overlap in the Actions.

3.      <u>Transfer Promotes Justice and Efficiency</u>.  Transfer of the Actions to a

single district for coordinated or consolidated pre-trial proceedings will promote the just

and efficient conduct of the Actions through the efficient use of judicial resources, the

prevention of duplicative discovery, and the avoidance of inconsistent pre-trial rulings.

4.      <u>The Actions Should be Transferred to the Northern District of Texas</u>.  The

United States District Court for the Northern District of Texas is the most suitable forum

in which the requested coordinated or consolidated pre-trial proceedings should be

conducted.  Defendants UICI, a Delaware corporation, and Mid-West, a Tennessee

corporation, both have their corporate headquarters in Texas, and Specialized Association

Services, a secondary defendant in some of the proceedings, is a Texas corporation with

its principal place of business in Texas.  Likewise, the NASE has its principal place of

business within the Northern District of Texas.  Thus, the majority of any existing

corporate documents likely to be the subject of anticipated discovery requests are located within the Northern District of Texas.  Additionally, coordination or consolidation in the Northern District of Texas will result in convenience and total cost savings.  The only purported class action among the Actions for which transfer is sought is pending in Texas.  Texas is also where all the plaintiffs to the purported state-wide class action necessarily reside.  Further, plaintiffs' counsel for the purported class action and two other Actions (pending in Mississippi) are located closer to the jurisdiction of the Northern District of Texas than any other jurisdiction in which any of the Actions are pending.  Finally, the Northern District of Texas is centrally located between the great majority of the Actions.

     5.     United States District Court Judge Sidney A. Fitzwater or Senior District Judge Barefoot Sanders are both particularly well-suited to handle the pre-trial management of these Actions.  Judge Fitzwater is a member of the Committee on Rules of Practice and Procedure of the Judicial Conference of the United States and has previously handled complex insurance-related actions transferred from the MDL Panel. Judge Sanders has previously served on the MDL Panel and likewise has extensive experience in coordinating complex, multidistrict litigation.

     **WHEREFORE**, Movants respectfully request that, pursuant to 28 U.S.C. § 1407, the MDL Panel order the transfer of the Actions listed on Attachment A to the United States District Court for the Northern District of Texas, Dallas Division, for coordinated or consolidated pre-trial proceedings and, with the consent of that court, to the docket of District Judge Sidney A. Fitzwater or Senior District Judge Barefoot Sanders.

**DATED:**  September 22, 2003.

Respectfully submitted,

Ralph I. Miller
T. Ray Guy
Yvette Ostolaza
Robert R. Summerhays
WEIL, GOTSHAL & MANGES LLP
200 Crescent Court
Suite 300
Dallas, TX 75201-6950
Telephone:  214-746-7700
Facsimile:  214-746-7777

David B. Hird
Holly E. Loiseau
WEIL, GOTSHAL & MANGES LLP
1501 K Street, Suite 100
Washington, D.C.  20005-1411
202-682-7000
Fax:  202-857-0940

Counsel for Defendants UICI, Mid-West
National Life Insurance Company of
Tennessee, and The MEGA Life and Health
Insurance Company

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

SEP 3 0 2003

FILED
CLERK'S OFFICE

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served by

certified mail, return receipt requested, on September 22, 2003, on the persons listed on

the attached Master Panel Service List for Plaintiffs and Defendants.

Holly E. Loiseau

RECEIVED
CLERK'S OFFICE
2003 SEP 22 P 2: 43
JUDICIAL PANEL ON
MULTIDISTRICT
LITIGATION

# MASTER PANEL SERVICE LIST

Joseph T. Acquaviva, Jr., Esq.
Amy L. Thomas, Esq.
Wilson Cain & Acquaviva-OKC
300 NW 13th St., Suite 100
Oklahoma City, OK 73103

Attorneys for Defendants The MEGA Life and Health Insurance Company and UICI in
Garcia v. The MEGA Life and Health Insurance Company.

Sheryl Bey, Esq.
Baker, Donelson, Bearman & Caldwell
P.O. Box 14167
Jackson, MS 39236

Attorney for Defendant The MEGA Life and Health Insurance Company in Webster v.
The MEGA Life and Health Insurance Co., Tomlin v. The MEGA Life and Health
Insurance Company, Bishop v. The MEGA Life and Health Insurance Company, Bailey
v. The MEGA Life and Health Insurance Company, and Clark v. The MEGA Life and
Health Insurance Company.

Andre H. Cronthall, Esq.
Sheppard Mullin Richter & Hampton
333 S. Hope Street, 48th Floor
Los Angeles, CA 90071-1448

Attorney for Defendants UICI and Mid-West National Life Insurance Company of
Tennessee in Correa v. UICI and for Defendants UICI, Mid-West National Life Insurance
Company of Tennessee, and Michael Davis in Portune v. UICI.

Randy D. Curry, Esq.
Law Offices of Randy D. Curry
2424 SE Bristol Avenue, Suite 250
Newport Beach, CA 92660

Attorneys for Plaintiff Debbie Correa in Correa v. UICI and for Plaintiffs Albert J.
Portune and Leslie Portune in Portune v. UICI.

Marion Wesley Frazier, Esq.
Dwight M. Francis, Esq.
Michael H. Francis, Esq.
Gardere Wynne Sewell LLP
1601 Elm Street, Suite 3000
Dallas, TX 75201

Attorneys for Defendants the National Association for the Self Employed and the NASE
Group Insurance Trust in Garcia v. The MEGA Life and Health Insurance Company.


Alice Garber, Esq.
Christopher J. Cox, Esq.
Weil Gotshal & Manges LLP
201 Redwood Shores Parkway
Redwood Shores, CA 94065

Attorneys for Defendants UICI, The MEGA Life and Health Insurance Company, and
Mid-West National Life Insurance Company of Tennessee in Lacy v. The MEGA Life
and Health Insurance Company.


Baldemar Garza, Esq.
Attorney at Law
200 E. Second Street
Rio Grande City, TX 78582

Attorneys for Defendants UICI and The MEGA Life and Health Insurance Company in
Garcia v. The MEGA Life and Health Insurance Company.


Michael D. Greer, Esq.
Greer, Pipkin & Russell
P.O. Box 907
117 N. Broadway Street
Tupelo, MS 38802-0907

Attorneys for Plaintiffs Herman Tomlin and Gary Harrison in Tomlin v. The MEGA Life
and Health Insurance Company, for Plaintiffs William E. Bailey, Mike Ellis, Windell E.
Pounds, and Clara Mae Pounds in Bailey v. The MEGA Life and Health Insurance
Company, for Plaintiffs Robert Pride, Effie D. Pride, Etheldra D. Haynie, Brandon A.
Mayo, Thomas A. Mills, Johnny Moore, Gary Nanney, and Royce Spears in Pride v. The
MEGA Life and Health Insurance Company, for Plaintiffs Harold D. Webster, Melvin
Glenn Gresham, and Sandra Gresham in Webster v. The MEGA Life and Health
Insurance Company, and for Plaintiffs Robert Clark and Donna R. Clark in Clark v. The
MEGA Life and Health Insurance Company.

Arnulfo Guerra, Jr., Esq.
Guerra & Guerra
1900 W. University, Suite 6 PMB40
Edinburg, TX 78539

Attorneys for Plaintiffs Frank Garcia, Cynthia Alaniz, and a purported class of persons similarly situated in Garcia v. The MEGA Life and Health Insurance Company.


T. Ray Guy, Esq.
Yvette Ostolaza, Esq.
Robert R. Summerhays, Esq.
Angela C. Wennihan, Esq.
Weil Gotshal & Manges
200 Crescent Court, Suite 300
Dallas, TX 75201

Attorneys for Defendants UICI and The MEGA Life and Health Insurance Company in Garcia v. The MEGA Life and Health Insurance Company.


John Samuel Hill, Esq.
Lamar Bradley Dillard, Esq.
Mitchell, McNutt & Sams
105 S. Front Street
Tupelo, MS 38804

Attorneys for Defendants William Phipps, Robert Wesley Pittman, and John Does 1-20 in Clark v. The MEGA Life and Health Insurance Company, for Defendants Chad Mills, Robert Wesley Pittman, Barry Lee, and John Does 1-20 in Pride v. The MEGA Life and Health Insurance Company, for Defendants William Phipps and John Does 1-20 in Tomlin v. The MEGA Life and Health Insurance Company, for Defendants Barry Lee, Chad Mills, William Phipps, and John Does 1-20 in Bailey v. The MEGA Life and Health Insurance Company, and for Defendants William Phipps, David Bernard, Chad Mills, and John Does 1-20 in Webster v. The MEGA Life and Health Insurance Company.


John Lee Malesovas, Esq.
David H. Martin, Esq.
Malesovas & Martin, LLP
425 Austin Avenue
Waco, TX 76701

Attorneys for Plaintiffs Frank Garcia, Cynthia Alaniz, and a purported class of persons similarly situated in Garcia v. The MEGA Life and Health Insurance Company.

Steven S. Mansell, Esq.
Mark A. Engel, Esq.
Steven S. Ashmore, Esq.
Mansell, Engel & Ashmore
101 Park Ave., Suite 665
Oklahoma City, OK 73102

Attorneys for Plaintiffs Lloyd H. Grigsby and Frances R. Grigsby in <u>Grigsby v. The MEGA Life and Health Insurance Company</u>.


Brian K. Mazen, Esq.
William E. von Behren, Esq.
Meserve Mumper & Hughes, LLP
300 S. Grand Ave., 24th Floor
Los Angeles, CA 90071-3185

Attorneys for Defendants the Alliance for Affordable Services, Specialized Association Services, William Callaghan, Jr., and Howard Segal in <u>Portune v. UICI</u>, and for Defendants the Alliance for Affordable Services, William Callaghan, Jr., Howard Segal, Paul Pevsner, M.D., Danelle Nixon, and Ace Loomis in <u>Correa v. UICI</u>.


Rene P. Montalvo, Esq.
Law Office of Rene P. Montalvo, P.C.
206 North Britton Street, Suite C
PO Box 16
Rio Grande City, TX 78582

Attorney for Plaintiffs Frank Garcia, Cynthia Alaniz, and a purported class of persons similarly situated in <u>Garcia v. The MEGA Life and Health Insurance Company</u>.


Joe D. Pegram, Esq.
1405 Jackson Ave.
P.O. Box 389
Oxford, MS 38655

Attorney for Plaintiff Billy Randall Bishop in <u>Bishop v. The MEGA Life and Health Insurance Company</u>.


Richard T. Phillips, Esq.
Smith, Phillips, Mitchell & Scott
103 Bates Street
P.O. Box 1586
Batesville, MS 38606

Attorney for Plaintiffs Robert Clark and Donna R. Clark in <u>Clark v. The MEGA Life and Health Insurance Company</u>, and for Plaintiffs Robert Pride, Effie D. Pride, Etheldra D.

Haynie, Brandon A. Mayo, Thomas A. Mills, Johnny Moore, Gary Nanney, and Royce Spears in Pride v. The MEGA Life and Health Insurance Company.


Kennedy P. Richardson, Esq.
Marion's Inn
1611 Telegraph Ave., Suite 707
Oakland, CA 94612-2145

Attorney for Defendants the National Association for the Self Employed and the Alliance for Affordable Services in Lacy v. The MEGA Life and Health Insurance Company.


Jamie Arturo Saenz, Esq.
Rodriguez , Colvin & Chaney, LLP
1201 E. Van Buren
Brownsville, TX 78522

Attorney for Defendants UICI and the MEGA life and Health Insurance Company in Garcia v. The MEGA Life and Health Insurance Company.


William M. Shernoff, Esq.
Evangeline F. Garris, Esq.
Shernoff Bidart & Darras, LLP
600 S. Indian Hill Blvd.
Claremont, CA 91711-5498

Attorneys for Plaintiff Debbie Correa in Correa v. UICI and for Albert J. Portune and Leslie Portune in Portune v. UICI.


Edward J. Simone, Esq.
Michael J. Reiser, Esq.
Law Offices of Reiser & Simone
1806 Bonanza Street
Walnut Creek, CA 94596

Attorneys for Plaintiff Sandra Lacy in Lacy v. The MEGA Life and Health Insurance Company.


Robert D. Tomlinson, Esq.
Coree L. Sinclair, Esq.
McKinney & Stringer-OKC
Corporate Tower
101 N. Robinson Ave., Suite 1300
Oklahoma City, OK 73102-5504

Attorneys for Defendant the National Association for the Self Employed in <u>Grigsby v. The MEGA Life and Health Insurance Company</u>.


Victor Vincent Vicinaiz, Esq.
Roerig Oliveira and Fisher
506 E. Dove Ave.
McAllen, TX 78504

Attorneys for Defendant the National Association for the Self Employed in <u>Garcia v. The MEGA Life and Health Insurance Company</u>.


Thomas A. Wicker, Esq.
Michael D. Tapscott, Esq.
Holland, Ray, Upchurch & Hillen, P.A.
322 Jefferson Street
Tupelo, MS 38804

Attorneys for Defendant the National Association for the Self Employed in <u>Tomlin v. The MEGA Life and Health Insurance Company</u>, <u>Bishop v. The MEGA Life and Health Insurance Company</u>, <u>Bailey v. The MEGA Life and Health Insurance Company</u>, <u>Clark v. The MEGA Life and Health Insurance Company</u>, <u>Webster v. The MEGA Life and Health Insurance Company</u>, and <u>Pride v. The MEGA Life and Health Insurance Company</u>.

## DISTRICT COURTS

United States District Court
Central District of California, Western Division
760 United States Courthouse
255 East Temple Street
Los Angeles, CA 90012
Case No. 03-CV-4778
Judge Florence-Marie Cooper


United States District Court
Central District of California, Eastern Division
George E. Brown Jr. Federal Building and Courthouse
3470 Twelfth Street
Riverside, CA 92501
Case No. 03-CV-1060
Judge Robert J. Timlin


United States District Court,
Northern District of California, Oakland Division
1301 Clay Street, 4th Floor
Oakland, CA 94612
Case No. 4:03-CV-02852
Judge Claudia Wilken


United States District Court
Northern District of Mississippi, Eastern Division
301 West Commerce, Street, Room 342*
Aberdeen, MS 39730
Case No. 03-CV-114
Case No. 03-CV-180
Case No. 03-CV-274
Chief Judge Glen H. Davidson


United States District Court
Northern District of Mississippi, Delta Division
388 Federal Building
911 Jackson Ave,
Oxford, MS 83655-1238
Case No. 03-CV-147
Senior Judge Neal B. Biggers
Case No. 03-CV-246
Chief Judge Glen H. Davidson (*see address listed above)

United States District Court
Northern District of Mississippi, Western Division
335 Federal Building
911 Jackson Ave,
Oxford, MS 83655-1238
Case No. 03-CV-103
Judge Michael P. Mills


United States District Court
Western District of Oklahoma, Oklahoma City Division
200 N.W. 4th Street, Room 5406
Oklahoma City, OK 73102
Case No. 03-CV-764
Judge Joe Heaton


United States District Court
Southern District of Texas, McAllen Division
Texas Commerce Center
1701 West Business Highway 83
McAllen, TX 78501
Case No. 03-CV-194
Judge Randy Crane

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

SEP 3 0 2003

FILED
CLERK'S OFFICE

# Exhibit A

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

SEP 3 0 2003

FILED
CLERK'S OFFICE

**BEFORE THE JUDICIAL PANEL
ON MULTIDISTRICT LITIGATION**

|  |  |  |
|---|---|---|
| IN RE ASSOCIATION-GROUP | : | |
| INSURANCE LITIGATION | : | **MDL DOCKET NO. _____** |
|  | : | |
|  | : | |

## SCHEDULE OF RELATED CASES

*Debbie Correa v. UICI; Mid-West National Life Insurance Company of Tennessee;
Alliance for Affordable Services; Cornerstone America; Specialized Association
Services; William Callaghan, Jr.; Howard Segal; Paul Pevsner, M.D.; Danelle Nixon;
Ace Loomis*
United States District Court, Central District of California, Western Division
Case No. 03-CV-4778
United States District Court Judge Florence-Marie Cooper

*Sandra Lacy v. MEGA Life and Health Insurance Company, an Oklahoma Insurance
Company; Mid-West National Life Insurance Company of Tennessee, a Tennessee
Insurance Company; NASE Group Insurance Trust; National Association for the Self
Employed aka NASE, a Texas Corporation; United Group Association, Inc.; Alliance for
Affordable Services; The Business and Professional Service Industry Trust; Cornerstone
Marketing of America; UICI, Inc., a Delaware Corporation and Does 1 through 200*
United States District Court, Northern District of California, Oakland Division
Case No. 4:03-CV-02852
United States District Court Judge Claudia Wilken

*Albert J. Portune and Leslie Portune v. UICI; Mid-West National Life Insurance
Company of Tennessee; Alliance for Affordable Services; Cornerstone America;
Specialized Association Services; William Callaghan, Jr.; Howard Segal; Paul Pevsner,
M.D.; Danelle Nixon; Ace Loomis; Michael Davis; and Does 1 through 100, inclusive*
United States District Court, Central District of California, Eastern Division

Case No. 03-CV-1060
United States District Court Judge Robert J. Timlin

*Herman Tomlin and Gary Harrison v. MEGA Life and Health Insurance Company;*
*NASE Group Insurance Trust; National Association for the Self-Employed aka NASE;*
*William L. Phelps; and John Does 1 through 20*
United States District Court, Northern District of Mississippi, Eastern Division
Case No. 03-CV-114
United States District Court Chief Judge Glen H. Davidson


*William E. Bailey; Mike Ellis; Windell E. Pounds, and Clara Mae Pounds v. MEGA Life*
*and Health Insurance Company; NASE Group Insurance Trust; National Association for*
*the Self-Employed aka NASE; Barry Lee; Chad Mills; William L. Phipps; and John Does*
*1 through 20*
United States District Court, Northern District of Mississippi, Eastern Division
Case No. 03-CV-180
United States District Court Chief Judge Glen H. Davidson


*Robert Pride; Effie D. Pride; Etheldra D. Haynie; Brandon A. Mayo; Thomas A. Mills;*
*Johnny Moore; Gary Nanney; Royce Spears; and Hudson Williams v. MEGA Life and*
*Health Insurance Company; NASE Group Insurance Trust; National Association for the*
*Self-Employed aka NASE; Chad Mills; Robert Wesley Pittman; Barry Lee; and John*
*Does 1 through 20*
United States District Court, Northern District of Mississippi, Delta Division
Case No. 03-CV-147
United States District Court Senior Judge Neal B. Biggers


*Robert Clark and Donna R. Clark v. MEGA Life and Health Insurance Company; NASE*
*Group Insurance Trust Fund; National Association for the Self-Employed aka NASE;*
*William L. Phillps; Robert Wesley Pittman; and John Does 1 through 20*
United States District Court, Northern District of Mississippi, Delta Division
Case No. 03-CV-246
United States District Court Chief Judge Glen H. Davidson


*Billy Randall Bishop v. David S. Barnard; MEGA Life and Health Insurance Company;*
*NASE Group Insurance Trust; and National Association for the Self-Employed aka NASE*
United States District Court, Northern District of Mississippi, Western Division
Case No. 03-CV-103
United States District Court Judge Michael P. Mills

*Harold D. Webster; Melvin Glenn Gresham and Sandra Gresham v. MEGA Life and Health Insurance Company; NASE Group Insurance Trust Fund; National Association for the Self-Employed aka NASE; William L. Phipps; David Bernard; Chad Mills; and John Does 1 through-20*
United States District Court, Northern District of Mississippi, Eastern Division
Case No. 03-CV-274
United States District Court Chief Judge Glen H. Davidson


*Lloyd H. Grigsby and Frances R. Grigsby v. The MEGA Life and Health Insurance Company; National Association for the Self-Employed; and UICI*
United States District Court, Western District of Oklahoma, Oklahoma City Division
Case No. 03-CV-764
United States District Court Judge Joe Heaton


*Frank Garcia and Cynthia Alaniz, on behalf of Themselves and a Class of Persons Similarly Situated v. MEGA Life and Health Insurance Company; NASE Group Insurance Trust; National Association for the Self-Employed aka NASE and UICI, Inc.*
United States District Court, Southern District of Texas, McAllen Division
Case No. 03-CV-194
United States District Court Judge Randy Crane

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

SEP 3 0 2003

FILED
CLERK'S OFFICE

**BEFORE THE JUDICIAL PANEL
ON MULTIDISTRICT LITIGATION**

| | | |
|---|---|---|
| IN RE ASSOCIATION-GROUP INSURANCE LITIGATION | : : : : : | MDL DOCKET NO. _____ |

**MEMORANDUM IN SUPPORT OF MOTION FOR TRANSFER AND
CONSOLIDATION IN THE
NORTHERN DISTRICT OF TEXAS**

Pursuant to 28 U.S.C. § 1407, Defendants UICI, Mid-West National Life

Insurance Company of Tennessee ("Mid-West), and The MEGA Life and Health

Insurance Company ("MEGA") (collectively, the "Moving Defendants") respectfully

submit this memorandum in support of their Motion Pursuant to 28 U.S.C. §1407 for

Transfer and Consolidation in the Northern District of Texas, Dallas Division, for pre-

trial proceedings (the "Transfer Motion").

**I. PRELIMINARY STATEMENT**

Currently, there are eleven similar association-group insurance actions

pending across the country (collectively, the "Actions") related to insurance provided by

**MEMORANDUM IN SUPPORT OF MOTION FOR TRANSFER AND
CONSOLIDATION IN THE
NORTHERN DISTRICT OF TEXAS**
Page 1
C:\DOCUMENTS AND SETTINGS\LOISEAU\LOCAL SETTINGS\TEMP\C.DATA.NOTES\BRIEF IN SUPPORT OF MULTIDISTRICT
TRANSFER_#345590.DOC

MEGA and Mid-West.[1]  Absent consolidation, these cases will produce eleven sets of nearly identical discovery requests and depositions.  Further, there is a substantial likelihood of inconsistent rulings if the cases are not consolidated for discovery and pre-trial proceedings.

Transfer of these actions to one, centrally located court would satisfy all of the goals of multidistrict litigation.  Indeed, this is a classic case for consolidation under the MDL statute:

- The Actions "involv[e] one or more common questions of fact" in that the allegations in each action centers on the alleged interrelationships between UICI, MEGA, and Mid-West and two not-for-profit associations and the alleged non-disclosure of these interrelationships to the plaintiffs in the Actions (together, "Plaintiffs");

- The transfer will further the "convenience of parties and witnesses" by avoiding redundant depositions and reducing the burden imposed on parties required to respond to duplicative discovery requests; and

- The transfer "will promote the just and efficient conduct of [the] actions" by ensuring centralized oversight of pre-trial fact development in what are likely to be highly complex actions – thus minimizing waste and inefficiency in the discovery process.

Further, the most appropriate transferee court is the Northern District of Texas.  The corporate headquarters for all of the corporate defendants and the NASE, one

---

[1] Association-group insurance is a particular type of health insurance available in certain states.  In simple terms, under certain state guidelines, association members are afforded an opportunity to collectively purchase health insurance from a health insurance company.

of the Associations, are within the Northern District of Texas.[2]  Likewise, these

defendants' documents are maintained in the Northern District of Texas.  Finally, the

Northern District of Texas is the geographic center between the districts in which the

majority of the Actions are pending.  District Judge Sidney A. Fitzwater and Senior

District Judge Barefoot Sanders have significant experience handling complex,

multidistrict cases, and each is particularly well-suited to handle the pre-trial management

of these Actions.

## II. RELEVANT FACTUAL BACKGROUND

1.     The Actions.  Midwest and MEGA sell health insurance in a variety of

states across the country.  In certain of those states, their health insurance is sold as

"association-group" insurance, which means (in basic terms) that their health insurance is

sold strictly to members of certain associations.  MEGA, in certain states, sells

association-group insurance to members of the National Association for the Self

Employed (the "NASE").  Mid-West, in certain states, sells association-group insurance

to members of the Alliance for Affordable Services (the "Alliance").  UICI is the parent

company of MEGA and Mid-West.  MEGA and Mid-West are both wholly-owned

subsidiaries of UICI.

2.     In all the Actions, Plaintiffs allege, among other things, that negligent

and/or intentional misrepresentations were made in connection with the marketing of

memberships in the NASE and/or the Alliance (collectively the "Associations") and their

---

[2] The registered mailing address for the other not-for-profit association is also within the
Northern District of Texas.

purchase of health insurance from MEGA or Mid-West. Plaintiffs claim they were

defrauded by the Moving Defendants because they were never advised of certain alleged

interrelationships between the Moving Defendants, the NASE and the Alliance before

joining the Associations and obtaining health insurance coverage from Midwest and

MEGA.[3]

      3.    <u>Overlapping Pleadings</u>. The Actions bear strong factual resemblance to

one another. A brief review of the common factual allegations contained in these

pleadings makes this clear:

      a.    The <u>Portune</u> and <u>Correa</u> Actions:[4] The <u>Correa</u> and <u>Portune</u>

complaints nearly mirror each other and, like all Actions referenced in this Transfer

Motion, contain factual averments rooted in fraudulent non-disclosure theories. For

example, in their complaints, the <u>Portune</u> plaintiffs and the <u>Correa</u> plaintiff allege:

> Defendants represented that by joining the ALLIANCE,
> Plaintiff[s] would receive quality group health insurance
> without paying expensive individual rates. Defendants
> represented that they selected UICI and MID-WEST to
> provide group insurance through negotiations to avoid high
> individual rates . . . *Defendants failed to advise [Plaintiffs]*

---

[3]    In addition to the Moving Defendants, the NASE, and the Alliance, the Actions also include other secondary defendants, including individual sales agents. Because the allegations contained in Plaintiffs' original pleadings are generally devoid of factual averments or causes of action related to these secondary defendants, they are not the primary focus of the Transfer Motion.

[4]    The Schedule of Actions is appended to the Transfer Motion as Attachment A and incorporated herein by reference. It contains the full citation to each action. Likewise, each current complaint or petition is found in the Moving Defendants' Exhibits in Support of Motion Pursuant to 28 U.S.C. § 1407 for Transfer and Consolidation in the Northern District of Texas, as Exhibits 1-11 and will be referenced herein as Def.'s Ex. "___."

> *that UICI and its wholly-owned subsidiaries, including MID-WEST, were aware of the ALLIANCE marketing scheme, supported the scheme and profited by it.*

(Correa Compl. ¶ 32 (Def.'s Ex. 1); Portune Compl. ¶ 34 (Def.'s Ex. 3) (emphasis added).)

        b.    The Garcia, Tomlin, and Bailey Actions:  The Garcia case is brought on behalf of a proposed statewide (Texas) class.  This is the only purported class action.  The factual averments contained in the Garcia petition are virtually identical to those contained in the Tomlin and Bailey complaints and echo the allegations of deceptive sales practices seen in all the Actions.[5]  For example, under the "Relationship of the Parties" heading in the Garcia petition and the Tomlin, and Bailey complaints, the plaintiffs aver that the associations and the Moving Defendants:

> [I]ntentionally concealed from Plaintiffs many material facts, including, but not limited to:  1) *all Defendants are under common ownership and control*; 2) *NASE is merely a marketing tool and profit center for Mega Life*; 3) the association "benefits" consist of nothing more than discounts and "information services" of negligible value which can commonly be obtained free of charge in connection with many purchases and services such as credit card ownership and travel club memberships; [and] 4) the "benefits package" is purchased by the NASE from a fulfillment company for approximately $2.00 per month per member but the NASE collects $15 or more per month from each member for these benefits.

(Garcia Pet. ¶ 4.01 (Def.'s Ex. 11); Tomlin Compl. ¶ 12 (Def.'s Ex. 4); Bailey Compl. ¶ 13 (Def.'s Ex. 5) (emphasis added).)

---

[5]    The petition in Garcia differs from the Tomlin and Bailey complaints (and the complaint or petition in the other pending Actions) in that it contains additional factual allegations typical in a class action pleading.

c.      The Bishop, Pride, Webster, and Clark Actions:  The complaints in

Bishop, Pride, Webster, and Clark substantially parallel the factual averments found in

the Garcia, Tomlin, and Bailey pleadings.  The complaints make the same "common

ownership and control" averments found in the Garcia, Tomlin, and Bailey pleadings;

contain factual allegations couched in terms of negligent and/or intentional concealment

also found in the Garcia, Tomlin, and Bailey pleadings; and, at times, borrow exact

language from the Garcia, Tomlin, and Bailey pleadings.  (Compare Bishop Compl. ¶ 11

(Def.'s Ex. 8) (alleging that "Defendants . . . intentionally concealed from Plaintiff many

material facts including but not limited to: 1) all Defendants are under common

ownership and control . . . 4) the 'benefits package' is purchased by the NASE from a

fulfillment company for approximately $2.00 per month per member . . . ."), Pride

Compl. ¶ 23 (Def.'s Ex. 6), Clark Compl. ¶ 12 (Def.'s Ex. 7), and Webster Compl. ¶ 23

(Def.'s Ex. 9) with Garcia Pet. ¶ 4.01 (Def.'s Ex. 11), Tomlin Compl. ¶ 12 (Def.'s Ex. 4),

and Bailey Compl. ¶ 13 (Def.'s Ex. 5).)

d.      The Grigsby Action:  The Grigsby plaintiffs similarly aver that

MEGA, UICI, and the NASE "colluded to defraud" them by making negligent and

intentional misrepresentations regarding the independence of the NASE.  (Grigsby Pet.

¶ 11 (Def.'s Ex. 10).)

e.      The Lacy Action:  Plaintiff Lacy brings suit against all the Moving

Defendants, alleging fraudulent and negligent misrepresentations arising from the

"fail[ure] to adequately and meaningfully disclose" the alleged interrelationships between

the Association and the Moving Defendants.  (Lacy Compl. ¶ 21 (Def.'s Ex. 2).)

## III.  ARGUMENT AND AUTHORITIES

### A.  THE ACTIONS SHOULD BE TRANSFERRED AND COORDINATED OR CONSOLIDATED FOR PRE-TRIAL PROCEEDINGS.

Title 28 U.S.C. § 1407(a) sets forth three criteria to guide the Judicial Panel on Multidistrict Litigation (the "MDL Panel") in its determination of whether transfer is appropriate:  (1) the cases "involv[e] one or more common questions of fact," (2) the transfer would further "the convenience of parties and witnesses," and (3) the transfer "will promote the just and efficient conduct of [the] actions."  28 U.S.C. § 1407 (2000).  Weaving the factual and legal circumstances raised by the Actions through these three statutory guideposts leads to one conclusion – transfer pursuant to § 1407 is appropriate.

#### 1.  The Actions Involve One or More Common Questions of Fact.

Section 1407(a) requires that cases to be transferred "involv[e] one or more common questions of fact."  28 U.S.C. § 1407(a) (2000).  As demonstrated by the overlapping factual averments cited above, the Actions undoubtedly stem from a common factual core.  The allegations contained in each petition or complaint overlap significantly, involve the same set of defendant associations and insurers, and, in most instances, assert identical legal theories.  (Compare Garcia Pet. ¶ 3.02 (Def.'s Ex. 11) ("Consumers are deceived by this arrangement . . .), Webster Compl. ¶ 2 (Def.'s Ex. 9), Bishop Compl. ¶ 2 (Def.'s Ex. 8), Pride Compl ¶ 2 (Def.'s Ex. 6), Bailey Compl. ¶ 2 (Def.'s Ex. 5), and Tomlin Compl. ¶ 2 (Def.'s Ex. 4) with Portune Compl. ¶ 15 (Def.'s Ex. 3) ("[M]embers are never told of the relationships"), Lacy Compl. ¶ 15 (Def.'s Ex.

2), Correa Compl. ¶ 13 (Def.'s Ex. 1), Grigsby Pet. ¶ 14 (Def.'s Ex. 10), and Clark Compl. ¶ 2 (Def.'s Ex. 7).)  Each action seeks to redress harm allegedly caused by the failure to disclose relations between certain of the defendants.  (See Garcia Pet. ¶ 9.01 (Def.'s Ex. 11); Webster Compl. ¶ 30 (Def.'s Ex. 9); Bishop Compl. ¶ 27 (Def.'s Ex. 8); Pride Compl. ¶ 51 (Def.'s Ex. 6); Bailey Compl. ¶ 29 (Def.'s Ex. 5); Tomlin Compl. ¶ 28 (Def.'s Ex. 4); Portune Compl. ¶ 41 (Def.'s Ex. 3); Lacy Compl. ¶ 40 (Def.'s Ex. 2); Correa Compl. ¶ 20 (Def.'s Ex. 1); Grigsby Pet. ¶ 17 (Def.'s Ex. 10); Clark Compl. ¶ 28 (Def.'s Ex. 7).)

Further, the alleged interrelationships between the Moving Defendants and the Associations will be undoubtedly the subject of overlapping pretrial motions and discovery in all of the Actions.  (See Garcia Pet. ¶ 4.01 (Def.'s Ex. 11); Webster Compl. ¶ 23 (Def.'s Ex. 9); Bishop Compl. ¶ 11 (Def.'s Ex. 8); Pride Compl. ¶ 23 (Def.'s Ex. 6); Bailey Compl. ¶ 13 (Def.'s Ex. 5); Tomlin Compl. ¶ 12 (Def.'s Ex. 4); Portune Compl. ¶ 34 (Def.'s Ex. 3); Lacy Compl. ¶ 21 (Def.'s Ex. 2); Correa Compl. ¶ 32 (Def.'s Ex. 1); Grigsby Pet. ¶ 11 (Def.'s Ex. 10); Clark Compl. ¶ 12 (Def.'s Ex. 7).)  The factual circumstances of the alleged interrelationships between the Moving Defendants and the defendant Associations are also complex.  For example, in each case, Plaintiffs allege that the Associations were structured by UICI as mere "marketing tool[s]" and "profit center[s]" for Mid-West and MEGA, their wholly-owned subsidiaries.  (See Garcia Pet. ¶ 4.01 (Def.'s Ex. 11); Webster Compl. ¶ 13 (Def.'s Ex. 9); Bishop Compl. ¶ 11 (Def.'s Ex. 8); Pride Compl. ¶ 23 (Def.'s Ex. 6); Bailey Compl. ¶ 13 (Def.'s Ex. 5); Tomlin Compl. ¶ 12 (Def.'s Ex. 4); Portune Compl ¶ 15 (Def.'s Ex. 3); Lacy Compl. ¶ 15 (Def.'s

Ex. 2); <u>Correa</u> Compl. ¶ 13 (Def.'s Ex. 1); <u>Grigsby</u> Pet. ¶ 11 (Def.'s Ex. 10); <u>Clark</u>

Compl. ¶ 12 (Def.'s Ex. 7).)  The complexity of these factual issues should further

persuade the Panel that transfer of the eleven cases is appropriate here.  <u>See, e.g.</u>, <u>In re</u>

<u>Clark Oil & Refining Corp. Antitrust Litig.</u>, 364 F. Supp. 458, 459 (J.P.M.L. 1973)

(discussing the complexity of factual issues as relevant to the transfer inquiry).

     Given the factual commonalities and complex nature of the Actions,

coordination or consolidation of the Actions for pre-trial purposes is proper.  <u>See, e.g.</u>, <u>In</u>

<u>re "Factor VIII or IX Concentrate Blood Prods.," Prod. Liab. Litig.</u>, 853 F. Supp. 454,

455 (J.P.M.L. 1993) (discussing common questions of fact regarding defendants'

conduct); <u>In re Alert Income Partners Sec. Litig.</u>, 788 F. Supp. 1230, 1231 (J.P.M.L.

1992) (describing common questions of fact concerning alleged misrepresentations and

omissions of information).

    **2.**    **Coordination or Consolidation Will Further the Convenience of**
           **Parties and Witnesses.**

     Transfer and coordination or consolidation of these Actions will also

further "the convenience of parties and witnesses."  28 U.S.C. § 1407(a) (2000).  Moving

Defendants anticipate that Plaintiffs in these Actions will each seek to separately depose

many of the same individuals and discover a significant number of the same documents.

<u>In re Alert Income Partners</u>, 788 F. Supp. at 1231.  Without coordination or

consolidation, there is a strong potential for duplicative discovery demands and redundant

depositions.  <u>Id.</u>

Consolidation will solve this problem by enabling a single judge to formulate a pre-trial case management program that will minimize witness inconvenience and overall expense for all the parties.  The total savings in time and expense resulting from this coordination or consolidation will ultimately benefit all parties to the association-group insurance litigation.  See, e.g., In re Cuisinart Food Processor Antitrust Litig., 506 F. Supp. 651, 655 (J.P.M.L. 1981) (stating that transfer would "effectuate a significant overall savings of cost and a minimum inconvenience to all concerned with the pretrial activities"); In re Stirling Homex Corp. Sec. Litig., 405 F. Supp. 314, 316 (J.P.M.L. 1975) ("[W]e are confident that Section 1407 treatment will allow the . . . plaintiffs to experience a net savings of time, effort and expenses through pooling their resources with other plaintiffs in the transferee district who share similar interests.").

### 3. Coordination or Consolidation Will Promote the Just and Efficient Conduct of These Actions.

Most importantly, transfer and coordination or consolidation of these Actions will "promote the just and efficient conduct of [the] actions." 28 U.S.C. Section 1407(a) (2000); see also In re Food Lion Inc., 73 F.3d 528, 532 (4th Cir. 1996) ("The multidistrict statute was enacted as a means of conserving judicial resources."). Significant for the purposes of this criterion are the aggregate cost savings and the total conservation of judicial resources to be gained by the transfer.  See In re Vernitron Sec. Litig., 462 F. Supp. 391, 393-94 (J.P.M.L. 1978).  Further, avoiding inconsistent outcomes regarding similar or identical legal and factual allegations promotes justice and, thus, furthers the goals of §1407.  See, e.g., In re Helicopter Crash Near Marsh Island, La., 461 F. Supp. 675, 676 (J.P.M.L. 1978) ("Transfer is . . . necessary in order to

prevent duplicative discovery, eliminate the possibility of conflicting pretrial rulings, and conserve the time and efforts of the parties and the judiciary.").

Where "an analysis of the complaints reveals a commonality of factual issues," transfer "is necessary in order to prevent duplication of discovery and eliminate the possibility of conflicting pretrial rulings." In re A.H. Robins Co. "Dalkon Shield" IUD Prods. Liab. Litig., 406 F. Supp. 540, 542 (J.P.M.L. 1975). This principle applies here. The Actions all involve the same set of defendants and all seek redress for the same allegedly fraudulent concealment of interrelationships. (Garcia Pet. ¶ 4.01 (Def.'s Ex. 11); Webster Compl. ¶ 23 (Def.'s Ex. 9); Bishop Compl. ¶ 11 (Def.'s Ex. 8); Pride Compl. ¶ 23 (Def.'s Ex. 6); Bailey Compl. ¶ 13 (Def.'s Ex. 5); Tomlin Compl. ¶ 12 (Def.'s Ex. 4); Portune Compl ¶ 34 (Def.'s Ex. 3); Lacy Compl. ¶ 21 (Def.'s Ex. 2); Correa Compl. ¶ 32 (Def.'s Ex. 1); Grigsby Pet. ¶ 11 (Def.'s Ex. 10); Clark Compl. ¶ 28 (Def.'s Ex. 7).) Coordination or consolidation of these like Actions in a single district will, thus, obviate the need for redundant depositions and discovery requests, streamline this litigation, and ensure that contradictory rulings are not made. See In re Temporomandibular Joint (TMJ) Implants Prods. Liab. Litig., 844 F. Supp. 1553, 1554 (J.P.M.L. 1994) (centralization "necessary in order to eliminate duplicative discovery, prevent inconsistent pretrial rulings . . . and conserve the resources of the parties, their counsel and the judiciary"); In re Silicone Gel Breast Implants Prods. Liab. Litig., 793 F. Supp. 1098, 1100 (J.P.M.L. 1992) (same).

In no case has a trial date been set. Further, in no case has any meaningful discovery taken place. Thus, transfer will not delay the progress of any of the Actions.

Without consolidation, a small group of corporate officers will be required to divide their time and resources among the pretrial demands of eleven separate lawsuits in four different states – all moving at a similar pace and simultaneously proceeding through discovery.[6] Narrowing the universe of districts in which discovery disputes are heard from eleven to one reduces the inefficient consumption of valuable judicial and corporate resources. Coordination or consolidation further benefits Plaintiffs through the pooling of shared discovery. See, e.g., In re Temporomandibular Joint (TMJ) Implants, 844 F. Supp at 1554.

The Moving Defendants anticipate that a host of prospective "tag-along" cases factually related to these Actions will be filed in the near future. Association-group insurance litigation has received national publicity and the number of related cases filed, thus far, has continued at a steady pace. See, e.g., Chad Terhune, Nonprofit Groups That Tout Insurance Have Hidden Links, THE WALL STREET JOURNAL, November 21, 2002, available at http://www.legacyalliance.net/articles/news/uici.htm (Def.'s Ex. 23). Thus,

---

[6]     In several cases, motions to remand are pending in the purported transferor courts. The pendency of these motions does not, however, reduce the efficiencies to be gained from coordinating these very similar cases. Instead, several common removal-related issues could be determined by the transferee court. See, e.g., In re Rezulin Prods. Liab. Litig., 168 F. Supp.2d 136, 142 (S.D.N.Y. 2001) (transferee court ruling on fraudulent joinder issues in conjunction with motions to remand filed in transferor courts); In re Ford Motor Co. Ignition Switch Prods. Liab. Litig., 19 F. Supp.2d 263, 265, 272 (D. N. J. 1998) (transferee court adjudicating remand motions filed in transferor courts in multidistrict litigation); In re Diet Drugs (Phentermine, Fenfluramine, Dexfenfluramine) Prods. Liab. Litig., No. 1203, MDL Pre-trial Order No. 2567 (E.D. Pa. 1998) (transferee court extensively analyzing the fraudulent joinder issue).

the anticipated total cost savings to be had through transfer, while sizeable now, is likely to increase in the future.[7]

Given the common factual questions raised by these Actions, extensive discovery will be duplicated absent coordination or consolidation of the Actions. In particular, the depositions of defendants' executives and employees will likely be taken multiple times on the same subjects. Moreover, many of the same pre-trial disputes are likely to arise in each case (e.g., issues concerning the nature and scope of discovery, privilege matters, and whether allegations of fraud have been pleaded with particularity). Justice will be served by preventing the likelihood of inconsistent judicial outcomes on these issues.

**B.   THE PANEL SHOULD TRANSFER THESE ACTIONS TO THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION.**

**1.   The Northern District of Texas Is the Most Convenient and Central Forum.**

The eleven Actions are presently pending in six separate districts in four different states. However, despite the geographic dispersion of the Actions, one district stands apart as the geographic and corporate center to this dispute – the Northern District of Texas.

This Panel has indicated that, pursuant to the language of 28 U.S.C. § 1407(a), one important factor in determining where to transfer actions for coordinated

---

[7]   For example, McCommon v. Mega Life and Health Insurance Co., is a recently-filed action similar to those before the MDL Panel. It is currently pending in state court, although Defendants anticipate removal of the action to the Southern District of Mississippi.

or consolidated multidistrict litigation is the convenience of the parties and witnesses.

See e.g., In re Rio Hair Naturalizer Prods. Liab. Litig., 904 F. Supp. 1407, 1408 (J.P.M.L.

1995).  With respect to this factor, the Panel has indicated that it will consider such

matters as the parties' principal place of business and the location of the documents and

witnesses necessary to conduct the pretrial proceedings.  See, e.g., In re Air Crash

Disaster Near Coolidge, Ariz., 362 F. Supp. 572, 573 (J.P.M.L. 1973) (location of

documents and anticipated witnesses important to consolidation decision); In re "Factor

VIII or IX Concentrate Blood Prods.", 853 F. Supp. at 455 (transferring to district where

two of the four defendants had significant contacts).  This factor strongly favors the

Northern District of Texas, Dallas Division.

Mid-West, MEGA, UICI and the NASE are all headquartered within the

Northern District of Texas.[8]  Specialized Association Services, another corporate

defendant in several actions, is also a Texas corporation headquartered within the

Northern District of Texas.  Many of the witnesses and documents that are likely to be

the subject of anticipated pre-trial discovery are, thus, located in this jurisdiction and the

Dallas division.  Further, plaintiffs' counsel for three of the actions, including the

purported Texas class action, is located in Waco, Texas, which is closer to the Northern

---

[8]    MEGA is incorporated in Oklahoma, but its corporate headquarters for its health
insurance business is in North Richland Hills, Texas, which is in the Northern District of
Texas; Mid-West is incorporated in Tennessee, but its corporate headquarters is in the
Northern District of Texas; UICI is incorporated in Delaware, but is corporate
headquarters is in the Northern District of Texas; and the NASE is incorporated in Texas
with its corporate headquarters in the Northern District of Texas.  The only other
principal defendant, the Alliance, is incorporated in Washington D.C., where no action is
currently pending.  However, its registered mailing address is in Hurst, Texas, which is in
the Northern District of Texas.

District of Texas than any other district in which any Action is pending. Additionally,

because the purported state-wide class action is pending in Texas (where all plaintiffs to

this potential class necessarily reside), the convenience of these witnesses is furthered by

this location. Finally, the Northern District of Texas is the geographic center between

most of the actions – those located in California and those located in Mississippi.[9]

   In similar circumstances, this Panel has transferred multidistrict litigation

to the sites of the defendant's corporate headquarters, the district where the greatest

number of witnesses and documents are likely to be found, or the district most centrally

located between pending actions. See, e.g., In re Salomon Bros. Treasury Sec. Litig., 796

F. Supp. 1537, 1538 (J.P.M.L. 1992) ("Salomon's allegedly illegal activities took place in

New York at Salomon's corporate headquarters, and documents and witnesses relating to

Salomon's conduct are located there"); see also In re Rio Hair Naturalizer Prods., 904 F.

Supp. at 1408 ("Although that district was not suggested by any of the parties . . . the

Eastern District of Michigan provides a geographically central location for this

nationwide litigation."); see also In re Air Crash Disaster at Sioux City, Iowa, 128 F.R.D.

131, 132 (J.P.M.L. 1989) (noting that "relevant documents can likely be found within this

district at [defendant's] headquarters"); In re Baldwin-United Corp. Litig., 581 F. Supp.

739, 741 (J.P.M.L. 1984) ("[M]any of the parties, potential witnesses and relevant

documents are located in the Southern District of New York (where defendant broker

dealer firms have their principal offices and headquarters."); In re Commonwealth

---

[9]  The Grigsby action is pending in Oklahoma City, Oklahoma, which is also
extremely close to Dallas and is accessible through a one-hour flight.

Oil/Tesoro Petroleum Sec. Litig., 458 F. Supp. 225, 230 (J.P.M.L. 1978) ("Furthermore, the corporate headquarters of COCO and TESORO are located in the Western District of Texas and, as a result, many relevant documents and witnesses are located there.").

Here, the balance of party and witness convenience and judicial efficiency favors the transfer of these Actions to the Northern District of Texas, Dallas Division, for coordination or consolidation.

   2.   **District Judge Sidney A. Fitzwater and Senior District Judge Barefoot Sanders Are Particularly Well-Suited to Handle the Pre-Trial Management of the Actions.**

Title 28 U.S.C. § 1407(b) requires the MDL Panel to transfer the actions to a specific judge (or judges) who will oversee the pre-trial management of the actions. 28 U.S.C. § 1407(b). Important to this determination can be a particular judge's expertise in handling complex multidistrict matters. See, e.g., In re Diet Drugs (Phentermine, Fenfluramine, Dexfenfluramine) Prods. Liab. Litig., 990 F. Supp. 834, 836 (J.P.M.L. 1998) (transferring to the Eastern District of Pennsylvania even though no action was currently pending there, in part, to transfer "to a distinguished jurist well versed in the intricacies of centralized pretrial proceedings under Section 1407"); In re Silicone Gel Breast Implants, 793 F. Supp. at 1100-01 (same). Here, based on their particular skill and experience handling complex matters, United States District Judge Sidney A. Fitzwater and United States Senior District Judge Barefoot Sanders are both particularly well-suited to oversee the pre-trial management and coordination or consolidation of these Actions.

Judge Fitzwater is a member of the Committee on Rules of Practice and Procedure of the Judicial Conference of the United States and has previously handled

complex insurance-related actions transferred from the MDL Panel.[10]  See In re Great

Southern Life Ins. Co. Sales Practices Litig., MDL No. 1214; see also In re American

Airlines, MDL No. 1019.  Further, Judge Fitzwater's docket is current.  See Report on

Motions, Bench Trials and Civil Cases Pending 3/32/03, 1 ALMANAC OF THE FEDERAL

JUDICIARY 54 (2003) ("Report") (Def.'s Ex. 27).  No pending motions appear on the

latest six-month Report.  Id.[11]

       Senior District Judge Barefoot Sanders is also well-suited to oversee pre-

trial coordination here.[12]  He served for seven and a half years as a member of the MDL

Panel under Chairman Judge John Nangle, served as Chair of the Judicial Conference

Committee on the Judicial Branch, and has extensive experience in coordinating

complex, multidistrict litigation.  See Judicial Panel on Multidistrict Litigation

Reorganized, THE THIRD BRANCH, available at

http://www.uscourts.gov/ttb/june00ttbb/jreorg.html (Def.'s Ex. 29).  For example, Judge

Sanders successfully consolidated twenty-six lawsuits brought by 157 investors against

---

[10]    A biography of Judge Sidney A. Fitzwater is attached as Def.'s Ex. 24.

[11]    The parties to these Actions will benefit from a transfer to Judge Fitzwater.  His
temperament is especially fitting of complex, multiparty cases and his proclivity toward
courtroom professionalism and orderly management in the administration of his docket
engenders confidence that he will manage the pre-trial coordination or consolidation of
the Actions with ease.  See Judge Sidney A. Fitzwater, Toward a Renaissance of
Professionalism in Trial Advocacy, 20 TEX. TECH L. REV. 787 (1990) ("The call for a
rebirth of professionalism is premised . . . upon the recognition that uncivil and
discourteous trial advocacy must be eliminated so that justice will not be denied either by
reason of excessive cost or unjustified delay.") ( Def.'s Ex. 25); see also Judge Sidney A.
Fitzwater, Professionalism: Viewing the Justice System as a Macrocosm, TEX. BAR J.
1086 (October 1990) (Def.'s Ex. 26).

[12]    A biography of Senior Judge Barefoot Sanders is attached as Def.'s Ex. 28.

various entities related to Quinn-L Corporation for alleged violations of federal securities and anti-racketeering laws. See Royal Ins. Co. of Am. v. Quinn-L Capital Corp., 759 F. Supp. 1216, 1218 (N.D. Tex. 1990), aff'd in part, rev'd in part, 960 F.2d 1286 (5th Cir. 1992); see also In re Southwestern Life Ins. Co. Sales Practice Litig., MDL No. 1528. Until recently, Judge Sanders also oversaw judicially-imposed desegregation efforts by the Dallas Independent School District. See Eva-Marie Ayala, School Desegregation Order Lifted, THE FORT WORTH STAR-TELEGRAM, June 6, 2003 (Def.'s Ex. 30).

Judge Sanders' reputation as a distinguished jurist capable of effectively coordinating complex multidistrict matters is without question. All parties to the Actions would benefit greatly from his multidistrict knowledge coordinating the pre-trial management of the association-group insurance litigation. As is the case with Judge Fitzwater, Judge Sanders' docket is current. See Report (Def.'s Ex. 27).

## IV. CONCLUSION AND REQUESTED RELIEF

The consolidation of these common Actions will further "the convenience of parties and witnesses" and "[will] promote the just and efficient conduct of [the] Actions." Therefore, pursuant to 28 U.S.C. §1407, the Moving Defendants respectfully request the MDL Panel to enter an order transferring the Actions to the United States District Court for the Northern District of Texas, Dallas Division, for coordinated or consolidated pre-trial proceedings and, with the consent of that court, to the docket of Judge Sidney A. Fitzwater or Judge Barefoot Sanders. The Moving Defendants also request any other relief to which they may be entitled.

**DATED:**  September 22, 2003

Respectfully submitted,

Ralph I. Miller
T. Ray Guy
Yvette Ostolaza
Robert R. Summerhays
WEIL, GOTSHAL & MANGES LLP
200 Crescent Court
Suite 300
Dallas, TX 75201-6950
Telephone:  214-746-7700
Facsimile:  214-746-7777

David B. Hird
Holly E. Loiseau
WEIL, GOTSHAL & MANGES LLP
1501 K Street, Suite 100
Washington, D.C.  20005-1411
Telephone:  202-682-7000
Facsimile:  202-857-0940

Counsel for Defendants UICI, Mid-West
National Life Insurance Company of
Tennessee, and The MEGA Life and Health
Insurance Company

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

SEP 30 2003

## CERTIFICATE OF SERVICE

FILED
CLERK'S OFFICE

I hereby certify that a true and correct copy of the foregoing was served by

certified mail, return receipt requested, on September 22, 2003, on the persons listed on

the attached Master Panel Service List for Plaintiffs and Defendants.

Holly E. Loiseau

RECEIVED
CLERK'S OFFICE
2003 SEP 22  P 2: 44
JUDICIAL PANEL ON
MULTIDISTRICT
LITIGATION

# MASTER PANEL SERVICE LIST

Joseph T. Acquaviva, Jr., Esq.
Amy L. Thomas, Esq.
Wilson Cain & Acquaviva-OKC
300 NW 13th St., Suite 100
Oklahoma City, OK 73103

Attorneys for Defendants The MEGA Life and Health Insurance Company and UICI in Garcia v. The MEGA Life and Health Insurance Company.


Sheryl Bey, Esq.
Baker, Donelson, Bearman & Caldwell
P.O. Box 14167
Jackson, MS 39236

Attorney for Defendant The MEGA Life and Health Insurance Company in Webster v. The MEGA Life and Health Insurance Co., Tomlin v. The MEGA Life and Health Insurance Company, Bishop v. The MEGA Life and Health Insurance Company, Bailey v. The MEGA Life and Health Insurance Company, and Clark v. The MEGA Life and Health Insurance Company.


Andre H. Cronthall, Esq.
Sheppard Mullin Richter & Hampton
333 S. Hope Street, 48th Floor
Los Angeles, CA 90071-1448

Attorney for Defendants UICI and Mid-West National Life Insurance Company of Tennessee in Correa v. UICI and for Defendants UICI, Mid-West National Life Insurance Company of Tennessee, and Michael Davis in Portune v. UICI.


Randy D. Curry, Esq.
Law Offices of Randy D. Curry
2424 SE Bristol Avenue, Suite 250
Newport Beach, CA 92660

Attorneys for Plaintiff Debbie Correa in Correa v. UICI and for Plaintiffs Albert J. Portune and Leslie Portune in Portune v. UICI.

Marion Wesley Frazier, Esq.
Dwight M. Francis, Esq.
Michael H. Francis, Esq.
Gardere Wynne Sewell LLP
1601 Elm Street, Suite 3000
Dallas, TX 75201

Attorneys for Defendants the National Association for the Self Employed and the NASE
Group Insurance Trust in <u>Garcia v. The MEGA Life and Health Insurance Company</u>.


Alice Garber, Esq.
Christopher J. Cox, Esq.
Weil Gotshal & Manges LLP
201 Redwood Shores Parkway
Redwood Shores, CA 94065

Attorneys for Defendants UICI, The MEGA Life and Health Insurance Company, and
Mid-West National Life Insurance Company of Tennessee in <u>Lacy v. The MEGA Life
and Health Insurance Company</u>.


Baldemar Garza, Esq.
Attorney at Law
200 E. Second Street
Rio Grande City, TX 78582

Attorneys for Defendants UICI and The MEGA Life and Health Insurance Company in
<u>Garcia v. The MEGA Life and Health Insurance Company</u>.


Michael D. Greer, Esq.
Greer, Pipkin & Russell
P.O. Box 907
117 N. Broadway Street
Tupelo, MS 38802-0907

Attorneys for Plaintiffs Herman Tomlin and Gary Harrison in <u>Tomlin v. The MEGA Life
and Health Insurance Company</u>, for Plaintiffs William E. Bailey, Mike Ellis, Windell E.
Pounds, and Clara Mae Pounds in <u>Bailey v. The MEGA Life and Health Insurance
Company</u>, for Plaintiffs Robert Pride, Effie D. Pride, Etheldra D. Haynie, Brandon A.
Mayo, Thomas A. Mills, Johnny Moore, Gary Nanney, and Royce Spears in <u>Pride v. The
MEGA Life and Health Insurance Company</u>, for Plaintiffs Harold D. Webster, Melvin
Glenn Gresham, and Sandra Gresham in <u>Webster v. The MEGA Life and Health
Insurance Company</u>, and for Plaintiffs Robert Clark and Donna R. Clark in <u>Clark v. The
MEGA Life and Health Insurance Company</u>.

Arnulfo Guerra, Jr., Esq.
Guerra & Guerra
1900 W. University, Suite 6 PMB40
Edinburg, TX 78539

Attorneys for Plaintiffs Frank Garcia, Cynthia Alaniz, and a purported class of persons similarly situated in Garcia v. The MEGA Life and Health Insurance Company.


T. Ray Guy, Esq.
Yvette Ostolaza, Esq.
Robert R. Summerhays, Esq.
Angela C. Wennihan, Esq.
Weil Gotshal & Manges
200 Crescent Court, Suite 300
Dallas, TX 75201

Attorneys for Defendants UICI and The MEGA Life and Health Insurance Company in Garcia v. The MEGA Life and Health Insurance Company.


John Samuel Hill, Esq.
Lamar Bradley Dillard, Esq.
Mitchell, McNutt & Sams
105 S. Front Street
Tupelo, MS 38804

Attorneys for Defendants William Phipps, Robert Wesley Pittman, and John Does 1-20 in Clark v. The MEGA Life and Health Insurance Company, for Defendants Chad Mills, Robert Wesley Pittman, Barry Lee, and John Does 1-20 in Pride v. The MEGA Life and Health Insurance Company, for Defendants William Phipps and John Does 1-20 in Tomlin v. The MEGA Life and Health Insurance Company, for Defendants Barry Lee, Chad Mills, William Phipps, and John Does 1-20 in Bailey v. The MEGA Life and Health Insurance Company, and for Defendants William Phipps, David Bernard, Chad Mills, and John Does 1-20 in Webster v. The MEGA Life and Health Insurance Company.


John Lee Malesovas, Esq.
David H. Martin, Esq.
Malesovas & Martin, LLP
425 Austin Avenue
Waco, TX 76701

Attorneys for Plaintiffs Frank Garcia, Cynthia Alaniz, and a purported class of persons similarly situated in Garcia v. The MEGA Life and Health Insurance Company.

Steven S. Mansell, Esq.
Mark A. Engel, Esq.
Steven S. Ashmore, Esq.
Mansell, Engel & Ashmore
101 Park Ave., Suite 665
Oklahoma City, OK 73102

Attorneys for Plaintiffs Lloyd H. Grigsby and Frances R. Grigsby in Grigsby v. The MEGA Life and Health Insurance Company.


Brian K. Mazen, Esq.
William E. von Behren, Esq.
Meserve Mumper & Hughes, LLP
300 S. Grand Ave., 24th Floor
Los Angeles, CA 90071-3185

Attorneys for Defendants the Alliance for Affordable Services, Specialized Association Services, William Callaghan, Jr., and Howard Segal in Portune v. UICI, and for Defendants the Alliance for Affordable Services, William Callaghan, Jr., Howard Segal, Paul Pevsner, M.D., Danelle Nixon, and Ace Loomis in Correa v. UICI.


Rene P. Montalvo, Esq.
Law Office of Rene P. Montalvo, P.C.
206 North Britton Street, Suite C
PO Box 16
Rio Grande City, TX 78582

Attorney for Plaintiffs Frank Garcia, Cynthia Alaniz, and a purported class of persons similarly situated in Garcia v. The MEGA Life and Health Insurance Company.


Joe D. Pegram, Esq.
1405 Jackson Ave.
P.O. Box 389
Oxford, MS 38655

Attorney for Plaintiff Billy Randall Bishop in Bishop v. The MEGA Life and Health Insurance Company.


Richard T. Phillips, Esq.
Smith, Phillips, Mitchell & Scott
103 Bates Street
P.O. Box 1586
Batesville, MS 38606

Attorney for Plaintiffs Robert Clark and Donna R. Clark in Clark v. The MEGA Life and Health Insurance Company, and for Plaintiffs Robert Pride, Effie D. Pride, Etheldra D.

Haynie, Brandon A. Mayo, Thomas A. Mills, Johnny Moore, Gary Nanney, and Royce Spears in <u>Pride v. The MEGA Life and Health Insurance Company</u>.


Kennedy P. Richardson, Esq.
Marion's Inn
1611 Telegraph Ave., Suite 707
Oakland, CA 94612-2145

Attorney for Defendants the National Association for the Self Employed and the Alliance for Affordable Services in <u>Lacy v. The MEGA Life and Health Insurance Company</u>.


Jamie Arturo Saenz, Esq.
Rodriguez , Colvin & Chaney, LLP
1201 E. Van Buren
Brownsville, TX 78522

Attorney for Defendants UICI and the MEGA life and Health Insurance Company in <u>Garcia v. The MEGA Life and Health Insurance Company</u>.


William M. Shernoff, Esq.
Evangeline F. Garris, Esq.
Shernoff Bidart & Darras, LLP
600 S. Indian Hill Blvd.
Claremont, CA 91711-5498

Attorneys for Plaintiff Debbie Correa in <u>Correa v. UICI</u> and for Albert J. Portune and Leslie Portune in <u>Portune v. UICI</u>.


Edward J. Simone, Esq.
Michael J. Reiser, Esq.
Law Offices of Reiser & Simone
1806 Bonanza Street
Walnut Creek, CA 94596

Attorneys for Plaintiff Sandra Lacy in <u>Lacy v. The MEGA Life and Health Insurance Company</u>.


Robert D. Tomlinson, Esq.
Coree L. Sinclair, Esq.
McKinney & Stringer-OKC
Corporate Tower
101 N. Robinson Ave., Suite 1300
Oklahoma City, OK 73102-5504

Attorneys for Defendant the National Association for the Self Employed in <u>Grigsby v. The MEGA Life and Health Insurance Company</u>.


Victor Vincent Vicinaiz, Esq.
Roerig Oliveira and Fisher
506 E. Dove Ave.
McAllen, TX 78504

Attorneys for Defendant the National Association for the Self Employed in <u>Garcia v. The MEGA Life and Health Insurance Company</u>.


Thomas A. Wicker, Esq.
Michael D. Tapscott, Esq.
Holland, Ray, Upchurch & Hillen, P.A.
322 Jefferson Street
Tupelo, MS 38804

Attorneys for Defendant the National Association for the Self Employed in <u>Tomlin v. The MEGA Life and Health Insurance Company</u>, <u>Bishop v. The MEGA Life and Health Insurance Company</u>, <u>Bailey v. The MEGA Life and Health Insurance Company</u>, <u>Clark v. The MEGA Life and Health Insurance Company</u>, <u>Webster v. The MEGA Life and Health Insurance Company</u>, and <u>Pride v. The MEGA Life and Health Insurance Company</u>.

## DISTRICT COURTS

United States District Court
Central District of California, Western Division
760 United States Courthouse
255 East Temple Street
Los Angeles, CA 90012
Case No. 03-CV-4778
Judge Florence-Marie Cooper


United States District Court
Central District of California, Eastern Division
George E. Brown Jr. Federal Building and Courthouse
3470 Twelfth Street
Riverside, CA 92501
Case No. 03-CV-1060
Judge Robert J. Timlin


United States District Court,
Northern District of California, Oakland Division
1301 Clay Street, 4th Floor
Oakland, CA 94612
Case No. 4:03-CV-02852
Judge Claudia Wilken


United States District Court
Northern District of Mississippi, Eastern Division
301 West Commerce, Street, Room 342*
Aberdeen, MS 39730
Case No. 03-CV-114
Case No. 03-CV-180
Case No. 03-CV-274
Chief Judge Glen H. Davidson


United States District Court
Northern District of Mississippi, Delta Division
388 Federal Building
911 Jackson Ave,
Oxford, MS 83655-1238
Case No. 03-CV-147
Senior Judge Neal B. Biggers
Case No. 03-CV-246
Chief Judge Glen H. Davidson (*see address listed above)

United States District Court
Northern District of Mississippi, Western Division
335 Federal Building
911 Jackson Ave,
Oxford, MS 83655-1238
Case No. 03-CV-103
Judge Michael P. Mills


United States District Court
Western District of Oklahoma, Oklahoma City Division
200 N.W. 4th Street, Room 5406
Oklahoma City, OK 73102
Case No. 03-CV-764
Judge Joe Heaton


United States District Court
Southern District of Texas, McAllen Division
Texas Commerce Center
1701 West Business Highway 83
McAllen, TX 78501
Case No. 03-CV-194
Judge Randy Crane

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

SEP 3 0 2003

FILED
CLERK'S OFFICE

**BEFORE THE JUDICIAL PANEL
ON MULTIDISTRICT LITIGATION**

IN RE ASSOCIATION-GROUP
INSURANCE LITIGATION

**MDL DOCKET NO. _____**

## REASON WHY ORAL ARGUMENT SHOULD BE HEARD

Pursuant to 28 U.S.C. § 1407 and Rule 16.1 of the Rules of Procedure of the Judicial Panel on Multidistrict Litigation (the "MDL Panel"), movants UICI, Mid-West National Life Insurance Company of Tennessee, and The MEGA Life and Health Insurance Company (the "Movants") respectfully submit this request for oral argument in conjunction with the Movants' Motion to Transfer the Association-Group Insurance Litigation to a single district court for coordinated or consolidated pre-trial proceedings.

The factual complexity and procedural posture of these association-group insurance cases and the geographic dispersement of the cases are such that oral argument will benefit the MDL Panel in its deliberations and ultimate decision-making role. Further, as opposition from the plaintiffs is anticipated, this Motion is particularly appropriate for argument.

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

2003 SEP 22   P 2: 44

RECEIVED
CLERK'S OFFICE

## REQUESTED RELIEF

**WHEREFORE**, Movants request relief pursuant to Rule 16.1, the MDL Panel

hear oral argument before taking matters under submission related to the requested

transfer of the association-group litigation to a single forum for coordinated or

consolidated pre-trial proceedings.

**DATED:**  September 22, 2003

Respectfully submitted,

Ralph I. Miller
T. Ray Guy
Yvette Ostolaza
Robert R. Summerhays
WEIL, GOTSHAL & MANGES LLP
200 Crescent Court
Suite 300
Dallas, TX 75201-6950
Telephone:  214-746-7700
Facsimile:  214-746-7777

David B. Hird
Holly E. Loiseau
WEIL, GOTSHAL & MANGES LLP
1501 K Street, Suite 100
Washington, D.C.  20005-1411
202-682-7000
Fax:  202-857-0940

Counsel for Defendants UICI, Mid-West
National Life Insurance Company of
Tennessee, and The MEGA Life and Health
Insurance Company

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

SEP 3 0 2003

FILED
CLERK'S OFFICE

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served by

certified mail, return receipt requested on September 22, 2003, on the persons listed on

the attached Master Panel Service List for Plaintiffs and Defendants.

Holly E. Loiseau

RECEIVED
CLERK'S OFFICE

2003 SEP 22   P 2: 44

JUDICIAL PANEL ON
MULTIDISTRICT
LITIGATION

# MASTER PANEL SERVICE LIST

Joseph T. Acquaviva, Jr., Esq.
Amy L. Thomas, Esq.
Wilson Cain & Acquaviva-OKC
300 NW 13th St., Suite 100
Oklahoma City, OK 73103

Attorneys for Defendants The MEGA Life and Health Insurance Company and UICI in Garcia v. The MEGA Life and Health Insurance Company.

Sheryl Bey, Esq.
Baker, Donelson, Bearman & Caldwell
P.O. Box 14167
Jackson, MS 39236

Attorney for Defendant The MEGA Life and Health Insurance Company in Webster v. The MEGA Life and Health Insurance Co., Tomlin v. The MEGA Life and Health Insurance Company, Bishop v. The MEGA Life and Health Insurance Company, Bailey v. The MEGA Life and Health Insurance Company, and Clark v. The MEGA Life and Health Insurance Company.

Andre H. Cronthall, Esq.
Sheppard Mullin Richter & Hampton
333 S. Hope Street, 48th Floor
Los Angeles, CA 90071-1448

Attorney for Defendants UICI and Mid-West National Life Insurance Company of Tennessee in Correa v. UICI and for Defendants UICI, Mid-West National Life Insurance Company of Tennessee, and Michael Davis in Portune v. UICI.

Randy D. Curry, Esq.
Law Offices of Randy D. Curry
2424 SE Bristol Avenue, Suite 250
Newport Beach, CA 92660

Attorneys for Plaintiff Debbie Correa in Correa v. UICI and for Plaintiffs Albert J. Portune and Leslie Portune in Portune v. UICI.

Marion Wesley Frazier, Esq.
Dwight M. Francis, Esq.
Michael H. Francis, Esq.
Gardere Wynne Sewell LLP
1601 Elm Street, Suite 3000
Dallas, TX 75201

Attorneys for Defendants the National Association for the Self Employed and the NASE
Group Insurance Trust in Garcia v. The MEGA Life and Health Insurance Company.


Alice Garber, Esq.
Christopher J. Cox, Esq.
Weil Gotshal & Manges LLP
201 Redwood Shores Parkway
Redwood Shores, CA 94065

Attorneys for Defendants UICI, The MEGA Life and Health Insurance Company, and
Mid-West National Life Insurance Company of Tennessee in Lacy v. The MEGA Life
and Health Insurance Company.


Baldemar Garza, Esq.
Attorney at Law
200 E. Second Street
Rio Grande City, TX 78582

Attorneys for Defendants UICI and The MEGA Life and Health Insurance Company in
Garcia v. The MEGA Life and Health Insurance Company.


Michael D. Greer, Esq.
Greer, Pipkin & Russell
P.O. Box 907
117 N. Broadway Street
Tupelo, MS 38802-0907

Attorneys for Plaintiffs Herman Tomlin and Gary Harrison in Tomlin v. The MEGA Life
and Health Insurance Company, for Plaintiffs William E. Bailey, Mike Ellis, Windell E.
Pounds, and Clara Mae Pounds in Bailey v. The MEGA Life and Health Insurance
Company, for Plaintiffs Robert Pride, Effie D. Pride, Etheldra D. Haynie, Brandon A.
Mayo, Thomas A. Mills, Johnny Moore, Gary Nanney, and Royce Spears in Pride v. The
MEGA Life and Health Insurance Company, for Plaintiffs Harold D. Webster, Melvin
Glenn Gresham, and Sandra Gresham in Webster v. The MEGA Life and Health
Insurance Company, and for Plaintiffs Robert Clark and Donna R. Clark in Clark v. The
MEGA Life and Health Insurance Company.

Arnulfo Guerra, Jr., Esq.
Guerra & Guerra
1900 W. University, Suite 6 PMB40
Edinburg, TX 78539

Attorneys for Plaintiffs Frank Garcia, Cynthia Alaniz, and a purported class of persons similarly situated in Garcia v. The MEGA Life and Health Insurance Company.


T. Ray Guy, Esq.
Yvette Ostolaza, Esq.
Robert R. Summerhays, Esq.
Angela C. Wennihan, Esq.
Weil Gotshal & Manges
200 Crescent Court, Suite 300
Dallas, TX 75201

Attorneys for Defendants UICI and The MEGA Life and Health Insurance Company in Garcia v. The MEGA Life and Health Insurance Company.


John Samuel Hill, Esq.
Lamar Bradley Dillard, Esq.
Mitchell, McNutt & Sams
105 S. Front Street
Tupelo, MS 38804

Attorneys for Defendants William Phipps, Robert Wesley Pittman, and John Does 1-20 in Clark v. The MEGA Life and Health Insurance Company, for Defendants Chad Mills, Robert Wesley Pittman, Barry Lee, and John Does 1-20 in Pride v. The MEGA Life and Health Insurance Company, for Defendants William Phipps and John Does 1-20 in Tomlin v. The MEGA Life and Health Insurance Company, for Defendants Barry Lee, Chad Mills, William Phipps, and John Does 1-20 in Bailey v. The MEGA Life and Health Insurance Company, and for Defendants William Phipps, David Bernard, Chad Mills, and John Does 1-20 in Webster v. The MEGA Life and Health Insurance Company.


John Lee Malesovas, Esq.
David H. Martin, Esq.
Malesovas & Martin, LLP
425 Austin Avenue
Waco, TX 76701

Attorneys for Plaintiffs Frank Garcia, Cynthia Alaniz, and a purported class of persons similarly situated in Garcia v. The MEGA Life and Health Insurance Company.

Steven S. Mansell, Esq.
Mark A. Engel, Esq.
Steven S. Ashmore, Esq.
Mansell, Engel & Ashmore
101 Park Ave., Suite 665
Oklahoma City, OK 73102

Attorneys for Plaintiffs Lloyd H. Grigsby and Frances R. Grigsby in Grigsby v. The MEGA Life and Health Insurance Company.


Brian K. Mazen, Esq.
William E. von Behren, Esq.
Meserve Mumper & Hughes, LLP
300 S. Grand Ave., 24th Floor
Los Angeles, CA 90071-3185

Attorneys for Defendants the Alliance for Affordable Services, Specialized Association Services, William Callaghan, Jr., and Howard Segal in Portune v. UICI, and for Defendants the Alliance for Affordable Services, William Callaghan, Jr., Howard Segal, Paul Pevsner, M.D., Danelle Nixon, and Ace Loomis in Correa v. UICI.


Rene P. Montalvo, Esq.
Law Office of Rene P. Montalvo, P.C.
206 North Britton Street, Suite C
PO Box 16
Rio Grande City, TX 78582

Attorney for Plaintiffs Frank Garcia, Cynthia Alaniz, and a purported class of persons similarly situated in Garcia v. The MEGA Life and Health Insurance Company.


Joe D. Pegram, Esq.
1405 Jackson Ave.
P.O. Box 389
Oxford, MS 38655

Attorney for Plaintiff Billy Randall Bishop in Bishop v. The MEGA Life and Health Insurance Company.


Richard T. Phillips, Esq.
Smith, Phillips, Mitchell & Scott
103 Bates Street
P.O. Box 1586
Batesville, MS 38606

Attorney for Plaintiffs Robert Clark and Donna R. Clark in Clark v. The MEGA Life and Health Insurance Company, and for Plaintiffs Robert Pride, Effie D. Pride, Etheldra D.

Haynie, Brandon A. Mayo, Thomas A. Mills, Johnny Moore, Gary Nanney, and Royce Spears in Pride v. The MEGA Life and Health Insurance Company.


Kennedy P. Richardson, Esq.
Marion's Inn
1611 Telegraph Ave., Suite 707
Oakland, CA 94612-2145

Attorney for Defendants the National Association for the Self Employed and the Alliance for Affordable Services in Lacy v. The MEGA Life and Health Insurance Company.


Jamie Arturo Saenz, Esq.
Rodriguez , Colvin & Chaney, LLP
1201 E. Van Buren
Brownsville, TX 78522

Attorney for Defendants UICI and the MEGA life and Health Insurance Company in Garcia v. The MEGA Life and Health Insurance Company.


William M. Shernoff, Esq.
Evangeline F. Garris, Esq.
Shernoff Bidart & Darras, LLP
600 S. Indian Hill Blvd.
Claremont, CA 91711-5498

Attorneys for Plaintiff Debbie Correa in Correa v. UICI and for Albert J. Portune and Leslie Portune in Portune v. UICI.


Edward J. Simone, Esq.
Michael J. Reiser, Esq.
Law Offices of Reiser & Simone
1806 Bonanza Street
Walnut Creek, CA 94596

Attorneys for Plaintiff Sandra Lacy in Lacy v. The MEGA Life and Health Insurance Company.


Robert D. Tomlinson, Esq.
Coree L. Sinclair, Esq.
McKinney & Stringer-OKC
Corporate Tower
101 N. Robinson Ave., Suite 1300
Oklahoma City, OK 73102-5504

Attorneys for Defendant the National Association for the Self Employed in <u>Grigsby v. The MEGA Life and Health Insurance Company</u>.


Victor Vincent Vicinaiz, Esq.
Roerig Oliveira and Fisher
506 E. Dove Ave.
McAllen, TX 78504

Attorneys for Defendant the National Association for the Self Employed in <u>Garcia v. The MEGA Life and Health Insurance Company</u>.


Thomas A. Wicker, Esq.
Michael D. Tapscott, Esq.
Holland, Ray, Upchurch & Hillen, P.A.
322 Jefferson Street
Tupelo, MS 38804

Attorneys for Defendant the National Association for the Self Employed in <u>Tomlin v. The MEGA Life and Health Insurance Company</u>, <u>Bishop v. The MEGA Life and Health Insurance Company</u>, <u>Bailey v. The MEGA Life and Health Insurance Company</u>, <u>Clark v. The MEGA Life and Health Insurance Company</u>, <u>Webster v. The MEGA Life and Health Insurance Company</u>, and <u>Pride v. The MEGA Life and Health Insurance Company</u>.

## DISTRICT COURTS

United States District Court
Central District of California, Western Division
760 United States Courthouse
255 East Temple Street
Los Angeles, CA 90012
Case No. 03-CV-4778
Judge Florence-Marie Cooper


United States District Court
Central District of California, Eastern Division
George E. Brown Jr. Federal Building and Courthouse
3470 Twelfth Street
Riverside, CA 92501
Case No. 03-CV-1060
Judge Robert J. Timlin


United States District Court,
Northern District of California, Oakland Division
1301 Clay Street, 4th Floor
Oakland, CA 94612
Case No. 4:03-CV-02852
Judge Claudia Wilken


United States District Court
Northern District of Mississippi, Eastern Division
301 West Commerce, Street, Room 342*
Aberdeen, MS 39730
Case No. 03-CV-114
Case No. 03-CV-180
Case No. 03-CV-274
Chief Judge Glen H. Davidson


United States District Court
Northern District of Mississippi, Delta Division
388 Federal Building
911 Jackson Ave,
Oxford, MS 83655-1238
Case No. 03-CV-147
Senior Judge Neal B. Biggers
Case No. 03-CV-246
Chief Judge Glen H. Davidson (*see address listed above)

United States District Court
Northern District of Mississippi, Western Division
335 Federal Building
911 Jackson Ave,
Oxford, MS 83655-1238
Case No. 03-CV-103
Judge Michael P. Mills


United States District Court
Western District of Oklahoma, Oklahoma City Division
200 N.W. 4th Street, Room 5406
Oklahoma City, OK 73102
Case No. 03-CV-764
Judge Joe Heaton


United States District Court
Southern District of Texas, McAllen Division
Texas Commerce Center
1701 West Business Highway 83
McAllen, TX 78501
Case No. 03-CV-194
Judge Randy Crane

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

SEP 3 0 2003

FILED
CLERK'S OFFICE

# BEFORE THE JUDICIAL PANEL
# ON MULTIDISTRICT LITIGATION

|  |  |  |
|---|---|---|
| IN RE ASSOCIATION-GROUP INSURANCE LITIGATION | : : : : | MDL DOCKET NO. _____ |

## MOVING DEFENDANTS' EXHIBITS IN SUPPORT OF
## MOTION PURSUANT TO 28 U.S.C. § 1407 FOR TRANSFER
## AND CONSOLIDATION IN THE NORTHERN DISTRICT OF TEXAS

Defendants UICI, Mid-West National Life Insurance Company of

Tennessee, and The MEGA Life and Health Insurance Company (collectively, the

"Moving Defendants") respectfully submit these exhibits in support of their motion

pursuant to 28 U.S.C. § 1407 for transfer and consolidation of the association-group

litigation in the Northern District of Texas, Dallas Division, for pre-trial proceedings:

| Exhibit No. | Description |
|---|---|
| 1 | First Amended Complaint and Demand for Jury Trial filed in *Debbie Correa v. UICI, Mid-West National Life Insurance Company of Tennessee, Alliance for Affordable Services, Cornerstone America, Specialized Association Services, William Callaghan, Jr., Howard Segal, Paul Pevsner, M.D., Danelle Nixon, Ace Loomis* |
| 2 | Complaint for Unfair Business Practices and Injunctive Relief filed in *Sandra Lacy v. MEGA Life and Health Insurance Company, an Oklahoma Insurance Company; Mid-West National Life Insurance Company of Tennessee, a Tennessee Insurance Company; NASE Group Insurance Trust; National Association for the Self Employed aka NASE, a Texas Corporation; United* |

| Exhibit No. | Description |
|---|---|
| | Group Association, Inc.; Alliance for Affordable Services; The Business and Professional Service Industry Trust; Cornerstone Marketing of America; UICI, Inc., a Delaware Corporation and Does 1 through 200 |
| 3 | Complaint filed in Albert J. Portune and Leslie Portune v. UICI, Mid-West National Life Insurance Company of Tennessee, Alliance for Affordable Services, Cornerstone America, Specialized Association Services, William Callaghan, Jr., Howard Segal, Paul Pevsner, M.D., Danelle Nixon, Ace Loomis, Michael Davis, and DOES 1 through 100, inclusive |
| 4 | Complaint filed in Herman Tomlin and Gary Harrison v. MEGA Life and Health Insurance Company, NASE Group Insurance Trust, National Association for the Self-Employed aka NASE, William L. Phelps, and John Does 1 through 20 |
| 5 | Complaint filed in William E. Bailey, Mike Ellis, Windell E. Pounds and Clara Mae Pounds v. MEGA Life and Health Insurance Company, NASE Group Insurance Trust, National Association for the Self-Employed aka NASE, Barry Lee, Chad Mills, William L. Phipps, and John Does 1 through 20 |
| 6 | Second Amended Complaint filed in Robert Pride, Effie D. Pride, Etheldra D. Haynie, Brandon A. Mayo, Thomas A. Mills, Johnny Moore, Gary Nanney, Royce Spears, and Hudson Williams v. MEGA Life and Health Insurance Company, NASE Group Insurance Trust, National Association for the Self-Employed aka NASE, Chad Mills, Robert Wesley Pittman, Barry Lee, and John Does 1 through 20 |
| 7 | Complaint filed in Robert Clark and Donna R. Clark vs. MEGA Life and Health Insurance Company, NASE Group Insurance Trust Fund, National Association for the Self-Employed aka NASE, William L. Phillps, Robert Wesley Pittman, and John Does 1 through 20 |
| 8 | Amended Complaint filed in Billy Randall Bishop vs. David S. Barnard, MEGA Life and Health Insurance Company, NASE Group Insurance Trust and National Association for the Self-Employed aka NASE |
| 9 | First Amended Complaint filed in Harold D. Webster, Melvin Glenn Gresham and Sandra Gresham vs. MEGA Life and Health Insurance Company, NASE Group Insurance Trust Fund, National Association for the Self-Employed aka NASE, William L. Phipps, David Bernard, Chad Mills, and John Does 1 through-20 |
| 10 | Petition filed in Lloyd H. Grigsby and Frances R. Grigsby, husband and wife v. The MEGA Life and Health Insurance Company; National Association for the Self-Employed; and UICI |
| 11 | Plaintiffs' First Amended Original Petition and Motion for Class Certification |

| Exhibit No. | Description |
|---|---|
| | filed in *Frank Garcia and Cynthia Alaniz, on behalf of Themselves and a Class of Persons Similarly Situated v. MEGA Life and Health Insurance Company, NASE Group Insurance Trust, National Association for the Self-Employed aka NASE and UICI, Inc.* |
| 12 | Docket Sheet for *Debbie Correa v. UICI, Mid-West National Life Insurance Company of Tennessee, Alliance for Affordable Services, Cornerstone America, Specialized Association Services, William Callaghan, Jr., Howard Segal, Paul Pevsner, M.D., Danelle Nixon, Ace Loomis* |
| 13 | Docket Sheet for *Sandra Lacy v. MEGA Life and Health Insurance Company, an Oklahoma Insurance Company; Mid-West National Life Insurance Company of Tennessee, a Tennessee Insurance Company; NASE Group Insurance Trust; National Association for the Self Employed aka NASE, a Texas Corporation; United Group Association, Inc.; Alliance for Affordable Services; The Business and Professional Service Industry Trust; Cornerstone Marketing of America; UICI, Inc., a Delaware Corporation and Does 1 through 200* |
| 14 | Docket Sheet for *Albert J. Portune and Leslie Portune v. UICI, Mid-West National Life Insurance Company of Tennessee, Alliance for Affordable Services, Cornerstone America, Specialized Association Services, William Callaghan, Jr., Howard Segal, Paul Pevsner, M.D., Danelle Nixon, Ace Loomis, Michael Davis, and DOES 1 through 100, inclusive* |
| 15 | Docket Sheet for *Herman Tomlin and Gary Harrison v. MEGA Life and Health Insurance Company, NASE Group Insurance Trust, National Association for the Self-Employed aka NASE, William L. Phelps, and John Does 1 through 20* |
| 16 | Docket Sheet for *William E. Bailey, Mike Ellis, Windell E. Pounds and Clara Mae Pounds v. MEGA Life and Health Insurance Company, NASE Group Insurance Trust, National Association for the Self-Employed aka NASE, Barry Lee, Chad Mills, William L. Phipps, and John Does 1 through 20* |
| 17 | Docket Sheet for *Robert Pride, Effie D. Pride, Etheldra D. Haynie, Brandon A. Mayo, Thomas A. Mills, Johnny Moore, Gary Nanney, Royce Spears, and Hudson Williams v. MEGA Life and Health Insurance Company, NASE Group Insurance Trust, National Association for the Self-Employed aka NASE, Chad Mills, Robert Wesley Pittman, Barry Lee, and John Does 1 through 20* |
| 18 | Docket Sheet for *Robert Clark and Donna R. Clark vs. MEGA Life and Health Insurance Company, NASE Group Insurance Trust Fund, National Association for the Self-Employed aka NASE, William L. Phillps, Robert Wesley Pittman, and John Does 1 through 20* |

| Exhibit No. | Description |
|---|---|
| 19 | Docket Sheet for *Billy Randall Bishop vs. David S. Barnard, MEGA Life and Health Insurance Company, NASE Group Insurance Trust and National Association for the Self-Employed aka NASE* |
| 20 | Docket Sheet for *Harold D. Webster, Melvin Glenn Gresham and Sandra Gresham vs. MEGA Life and Health Insurance Company, NASE Group Insurance Trust Fund, National Association for the Self-Employed aka NASE, William L. Phipps, David Bernard, Chad Mills, and John Does 1 through-20* |
| 21 | Docket Sheet for *Lloyd H. Grigsby and Frances R. Grigsby, husband and wife v. The MEGA Life and Health Insurance Company; National Association for the Self-Employed; and UICI* |
| 22 | Docket Sheet for *Frank Garcia and Cynthia Alaniz, on behalf of Themselves and a Class of Persons Similarly Situated v. MEGA Life and Health Insurance Company, NASE Group Insurance Trust, National Association for the Self-Employed aka NASE and UICI, Inc.* |
| 23 | Chad Terhune, <u>Nonprofit Groups that Tout Insurance Have Hidden Links</u>, THE WALL STREET JOURNAL, November 21, 2002, <u>available at</u> <u>http://www.legacyalliance.net/articles/news/uici.htm</u> |
| 24 | Biography of Judge Sidney A. Fitzwater |
| 25 | Judge Sidney A. Fitzwater, <u>Toward a Renaissance of Professionalism in Trial Advocacy</u>, 20 TEX. TECH L. REV. 787 (1990) |
| 26 | Judge Sidney A. Fitzwater, <u>Professionalism: Viewing the Justice System as a Macrocosm</u>, TEX. BAR J. 1086 (October 1990) |
| 27 | <u>Report on Motions, Bench Trials and Civil Cases Pending 3/32/03</u>, 1 ALMANAC OF THE FEDERAL JUDICIARY 54 (2003) |
| 28 | Biography of Senior Judge Barefoot Sanders |
| 29 | <u>Judicial Panel on Multidistrict Litigation Reorganized</u>, THE THIRD BRANCH, available at <u>http://www.uscourts.gov/ttb/june00ttbb/jreorg.html</u> |
| 30 | Eva-Marie Ayala, <u>School Desegregation Order Lifted</u>, THE FORT WORTH STAR-TELEGRAM, June 6, 2003 |

**DATED:** September 17, 2003

Respectfully submitted,

Yvette Ostolaza
Robert R. Summerhays
Angela C. Wennihan
WEIL, GOTSHAL & MANGES LLP
200 Crescent Court, Suite 300
Dallas, TX 75201-6950
214-746-7700
Fax: 214-746-7777

David B. Hird
Holly E. Loiseau
WEIL, GOTSHAL & MANGES LLP
1501 K Street, Suite 100
Washington, D.C. 20005-1411
202-682-7000
Fax: 202-857-0940

Counsel for Defendants
UICI; Mid-West National Life Insurance
Company of Tennessee; and The MEGA
Life and Health Insurance Company

**23**

# THE WALL STREET JOURNAL.
### ONLINE

**November 21, 2002**

PAGE ONE

## Nonprofit Groups That Tout Insurance Have Hidden Links

*Associations That Offer Deals Are Often Set Up by Insurers*

**By CHAD TERHUNE**
**Staff Reporter of THE WALL STREET JOURNAL**

WILLOW SPRINGS, Mo. -- In 1998, Robbie and Shirley Collins were offered health insurance through the Eagle Consumer Association, a nonprofit organization with almost 40,000 members. At $168 a month, the policy was less expensive than coverage offered by the state's Blue Cross and Blue Shield carrier. So Mr. Collins, a 39-year-old lumberyard employee, paid $90 in annual dues to join Eagle Consumer.

Mr. Collins thought he had a good deal with an independent association. What he didn't know was that Eagle Consumer was founded by Central Reserve Life Insurance Co., which issued his policy. In fact, one of the company's managers was president of the association at the time Mr. Collins enrolled. And last year, the family was hit with three rate increases over the course of seven months, pushing the monthly premium up 76% to $451 for the couple and their two young sons.



Robbie and Shirley Collins

The Collins family is among a growing number of Americans -- primarily the self-employed, early retirees and families whose employers don't offer coverage -- now buying health insurance through associations. These groups make enticing promises to people looking for affordable medical coverage: large memberships that yield group discounts; advocacy on behalf of the "little guy"; and independent endorsements of the best policies available at the best rates.

What the groups don't tell customers is how they exploit a giant loophole in the rules that protect policyholders. More than two decades ago, states began to recognize that associations offering insurance to their members across the country potentially faced 50 sets of conflicting laws. The solution in most states was to exempt these groups from many regulations, especially when it came to rates. In return, an association had to demonstrate that it wasn't established just to sell insurance -- a standard adopted by more than 40 states.

An investigation of insurance industry practices shows that this exemption has led to widespread abuse. Some consumers are misled into thinking they are

## INDUSTRY NEWS

For more health coverage, visit the Online Journal's Health Industry Edition at wsj.com/Health[2], and receive daily Health e-mails[3].

See a guide[3] to unraveling ties between nonprofits and insurers.

## A GUIDE TO UNRAVELING TIES

Here's a guide to digging deeper into the relationship between an association and the insurance carrier it endorses:

• Be wary of associations that charge high enrollment fees, say $100 or more, to be eligible to buy insurance. Some associations say this one-time fee reimburses the insurer for checking medical records and other administrative costs, but many insurance companies

dealing with associations that make independent decisions about the insurance they endorse. In reality insurers and insurance agents are frequently creating or buying their own associations and making them look like traditional nonprofit groups. They often make misleading claims about the groups' origins and membership size. Far from being independent, many of these associations serve primarily as a marketing arm for the insurer or agency. Some associations turn over a portion of their dues to insurers or insurance agents.

The health coverage sold through these associations isn't always what it seems, either. Associations typically don't have to get government approval for premium increases or explain to regulators how they set their rates. That means they can, and often do, offer low teaser rates that rise sharply after consumers enroll. Policyholders sometimes find unexpected gaps in their policies after they fall ill. Some consumers become trapped by an illness that makes them uninsurable elsewhere.

Eagle Consumer offers members discounts on travel, flowers and other items. It was formed in 1990 by Central Reserve Life, says Ernest J. White, a retired lobbyist for the insurer, which is a unit of **Ceres Group** Inc. in Cleveland. Mr. White says he served as the association's president until 1995, while continuing to work for the insurer. Robert D. Haas, now retired, headed Eagle Consumer from 1995 to 1998, also while working for the insurer. Mr. Haas says he was "more or less a figurehead." Today, a Missouri insurance agent runs Eagle Consumer.

As for the Collins family, Ceres says that last year its association policyholders in Missouri all received the same premium increases, pegged to the date they signed their contracts. The company cited rising medical costs. A Ceres spokeswoman says "all relationships with the Eagle Consumer Association are separate and distinct."

Government officials estimate that there could be as many as two million policyholders nationwide with association coverage. A review of state-insurance-department filings, association records and interviews with industry executives and regulators shows that more than 50 associations are used as a marketing arm by about two dozen insurers.

Supporters of association coverage say it gives working-class people access to more insurance choices at affordable prices at a time when many insurers have stopped selling to individuals because of losses or frustrations with regulation. "Even if you go ahead and form an association just for the purposes of insurance, why should that even be a concern?" says George Katosic, a Dallas attorney who has represented associations. "The more ways that health insurance is made available to consumers, especially at a reasonable premium, the better."

Some state insurance officials agree. But regulators in a few states say that as the association business has grown, so have the number of complaints from consumers. South Carolina's insurance department is considering legislation to force association carriers to follow the same rules as other insurers. Texas officials say they plan to scrutinize relationships between associations and their endorsed carriers. South Dakota already is looking at associations to make sure they were not formed only to sell insurance. It refuses to allow policies endorsed

factor such costs into their premiums.

• Ask whether the association limits the insurance company's profits or rate increases on the association's business. Some associations that look out for their members cap an insurer's profit margin at 3% to 5% of total premiums.

• Ask whether a portion of association dues are paid to insurance agents for enrolling members. If an agent doesn't provide the information, check public filings. If the group is tax-exempt under federal law, the payments may be revealed in an association's filings, sometimes Form 1024, with the Internal Revenue Service.

• Ask the insurance company if the same policy endorsed by the association is available to the general public. If so, joining an association may be unnecessary.

• Look at an association's Web site. Some provide a list of board members and officers, complete with occupations. Check the group's incorporation papers, filed with a state's secretary of state office, to see who formed the group. It's a red flag if anyone working with the association is affiliated with the endorsed carrier or an insurance agency selling the policies.

• Don't take an association's word for how long it has been around. Some associations exaggerate their history by taking over

by those associations to be sold in the state.

Many associations do make decisions that are in the best interests of their members. Bar associations and other professional groups use their group-buying power to guarantee members health coverage regardless of their medical history. For example, Communicating for Agriculture and the Self-Employed, a 80,000-member group started 30 years ago, dropped its endorsement of an insurer in 1998 because its policies weren't covering members' medical bills.

an older, inactive nonprofit group and changing its name. Again, check incorporation papers.

### Founding Father

Many in the industry credit Texas insurance titan Ronald Jensen with popularizing the notion of marketing health coverage through associations. Mr. Jensen founded UICI, a Dallas-based insurance company, in 1984. A year later he took over the National Association for the Self-Employed from an insurance agent. His system of a nationwide force of agents selling association-endorsed health policies captured the attention of the insurance industry. "Everybody tried to match us after we became successful," he says. "They set up their own associations and they tried to do everything exactly like us."

NASE also does political lobbying on behalf of small-business owners and offers advice over the phone about business problems. It offers a variety of discounts.



Mr. Jensen, the 72-year-old chairman of UICI, says the insurance company "probably at times gets closer than it should" to the three associations through which it primarily sells insurance. But he says, "The bottom line is: Can I look members in the eye and tell them they are getting a good deal? You are damn right I can."

One of the groups UICI sells policies through is Americans for Financial Security, a 30,000-member association based in Dallas that promises small entrepreneurs savings on items such as phone service, package delivery and health insurance. Mr. Jensen's son, Jeffrey, started the association in 1992. A UICI executive served on Americans for Financial Security's three-member board, but recently resigned. Jeffrey Jensen declined to be interviewed.

*Ronald Jensen*

UICI had 313,000 association policyholders as of Sept. 30, up from about 200,000 policyholders at the start of 2001. It sells association policies in 38 states. Revenue at the UICI division that sells those policies rose 24% last year to $700 million. Those results have helped make UICI an industry leader and wowed investors. The company's stock price has more than doubled since Jan. 1, 2001, when it was $5.94 a share. It closed Wednesday at $16.15, up 56 cents, or 3.59%, in 4 p.m. composite trading on the New York Stock Exchange.

Many association policyholders buy their insurance after responding to newspaper advertisements, direct-mail pieces or signs tacked to telephone poles by agents promoting "Affordable Health Insurance." They are approached by insurance agents who wear shirts or carry business cards identifying themselves as association representatives.

At a training session in 1993, an executive at Ronald Jensen's insurance agency, now owned by UICI, told agents selling association policies about the advantages of being seen as an enroller. "It feels like a much lower pressure presentation," the executive said, according to a transcript. "The whole temperature of a presentation is different, isn't it, if we're in there as a NASE enroller as opposed to an insurance agent?"

The transcript was used as evidence by Kansas policyholders in a suit filed in federal court in Kansas City against Ronald Jensen, NASE, UICI and another insurer in 1998. The suit alleged that they had "implemented a fraudulent marketing scheme" by "intentionally representing to consumers that NASE was independent and had

negotiated the best possible deal for consumers in health insurance." UICI says it settled for $1 million without admitting any liability.

## Behind the Scenes

Even for sophisticated consumers, it is hard to figure out whether an association is truly independent. The National Business Association, based in Dallas, says it was founded in 1982 and aims to "assist the self-employed and small business community in achieving their professional goals," according to its Web site. The organization offers discounts on automobile repair and other items, college scholarships and business services such as software to help obtain business loans. It also publishes a magazine for small-business owners.



**CLOSE RELATIONS**

A growing number of consumers are buying health insurance through seemingly independent associations that claim to offer better deals. But some associations are linked to particular insurance companies. Below, one example:

*Sources: Ronald Jensen, UICI, NASE, AFS*

But back in 1982, the group was known as the Health Through Exercise Association, according to Missouri records. It was started by Dale Turvey, owner of National Association Consultants Inc. in Chesterfield, Mo., which forms nonprofit associations.

An insurance agent, Mr. Turvey sometimes taps his employees, family members and friends to serve as officers of these associations. He acts as benefits administrator for several associations, including the Eagle Consumer group and often recommends which insurer the groups should endorse. "To the best of my knowledge, none of the associations we manage or administer are controlled by an insurance company or agency," he says.

Stan Firebaugh, the owner of a national insurance agency in Dallas, says he took control of the Health Through Exercise group in 1987. At around that time its name was changed to the National Business Association. Mr. Firebaugh's insurance agency made a proposal to American National Insurance Co. of Galveston, Texas, on how to put the National Business Association to use, according to officials with the agency and the insurer. "The concept embodied in this proposal -- namely that of mass-marketing health insurance products via monthly bank authorizations to self-employed individuals through a captive, nonprofit association -- is a successful, well-established concept," the agency wrote. The NBA began endorsing American National as its insurer in 1989. Mr. Firebaugh's agency receives commissions on policy sales and a share of association dues.

He denies any involvement with the proposal to American National and says the National Business Association

is completely independent. The association "was never set up to sell strictly health insurance," he says.

For a decade, Patrick Archibald served as president or a board member of the National Business Association and manager of Mr. Firebaugh's insurance agency. In effect, he was touting his agency's product to his association's members. He left the insurance agency in 1998 but stayed on at the association until April 2001. Mr. Archibald could not be reached.

"The association was portrayed as independent," says Betty Wendland, 61, a retired saleswoman who joined the NBA and bought its insurance in 1999. "You joined this group and then you buy this insurance. I never assumed they were one and the same." Mrs. Wendland's rates went up 61% over the course of eight months before she found a new policy from a different insurer last year. "At my age, it isn't easy to get insurance," she says.

Mrs. Wendland and some other policyholders learned about the cozy relationship from an agent after American National cut benefits and raised premiums in 1999.

She and others filed a class-action suit in 2000 in state court in Austin, Texas, claiming that the NBA, Mr. Firebaugh's agency and American National had marketed insurance "through a sham organization." The suit alleges that more than 60,000 customers were defrauded and that the NBA "exists primarily for the purpose of selling health insurance and making profits."

William Watson, American National's chief health actuary, said in a deposition last year that it didn't concern him that Mr. Archibald was running the association and the insurance agency. American National declined to comment because the litigation is pending. The defendants, including Mr. Archibald and Mr. Firebaugh, have denied the allegations in the suit.

## Unhappy Customers

Some policies offered by associations are hard to understand. UICI's typical policies feature a complex schedule of coverage for medical expenses. For example, many UICI policies cap hospital room and board benefits at $300 to $400 per day. Hospital room and board on average cost nearly $700 a day last year, according to insurance-industry data. Customers can add "riders" to augment their coverage. Most policies offered by other insurers pay nearly all of a patient's medical expenses after co-payments and deductibles are met.

Merrideth Tidwell, a former manager for UICI in Sarasota, Fla., says her superiors taught agents to withhold information about coverage limits from prospective customers. Ms. Tidwell, a top producing agent, according to a UICI internal newsletter, says she was instructed by managers to tear out a page from a brochure that explains coverage limits, or to not give brochures to customers.

The brochure, for example, explains that on UICI's Freedom 300 plan the insurer pays 100% "up to $300 per day" for hospital room and board, "up to $900 per day" for intensive care and that an 80% payment of miscellaneous in-hospital charges is capped at a "maximum of $18,000."

Rather than share that information, Ms. Tidwell says her managers created their own sales sheet for agents by photocopying the "plan benefit" page and adding 100% or 80% along the-right hand side, leaving out the maximums. This sales sheet makes it appear that the policies would pay 100% of hospital room and board, intensive care, an anesthesiologist's charges and some other surgical expenses on an unlimited basis. Four other UICI agents say they also were told to use the sheets in their sales presentations.

"They are training agents to trick the consumer," says Ms. Tidwell, 27. Last summer, she says, she began looking into typical hospital charges and competitors' policies. She says she was fired last month after she began raising questions about sales practices. Her bosses told her she was fired because her husband had begun selling a competitor's policies, she says.

UICI Chief Executive Gregory Mutz says he is "appalled" by the claim that agents are trained to withhold information. "I find it incomprehensible and outrageous that any agent engages in behavior that is clearly unethical and clearly illegal," Mr. Mutz says. UICI says it terminated two of Ms. Tidwell's supervisors last week after an internal investigation. The company says it is retraining some of its 2,800 active agents.



Robert and Barbara
Bloedel

In October 2000, Barbara and Robert Bloedel of Fort Myers, Fla., got a call asking if they were interested in joining Americans for Financial Security, the association founded by Jeffrey Jensen. The Bloedels recently had started their own Internet clothing business. During a visit to their house, the Bloedels say, an agent explained the advantages of joining, including tax and legal advice and discounts on office supplies. The agent assured the Bloedels that the UICI policy endorsed by the group was comparable to their existing coverage, the couple says. The Bloedels paid $540 in annual dues in order to receive the health policy for $358 a month.

When Mr. Bloedel underwent open-heart surgery a year later, the policy paid about $29,000 toward the surgery and a weeklong hospital stay. That left the Bloedels to pay $45,000 out of their retirement savings. The Bloedels likely would have paid far less under their previous Mutual of Omaha Insurance Co. policy, which had a $5,000 deductible. "I'm afraid we made a really stupid decision," says Mrs. Bloedel. "We trusted what the insurance salesman was saying. Insurance is like a foreign language to us."

Now other insurers will not accept Mr. Bloedel because of his heart condition. UICI raised their premiums 34% this fall to $598 a month. "My husband is 10 years from Medicare," says Mrs. Bloedel. "This is going to cost us big-time."

The Bloedels' agent, John L. Patterson, declined to comment, but in a letter to the Florida insurance department he said that the couple "determined that the ... coverage was suitable for their needs." He also denied making any comparison to their previous policy.

Kevin Cruse, a 46-year-old firefighter in Parsons, Kan., says he canceled his National Association for the Self-Employed policy last year after six months because he says it paid so few of his family's medical claims. "The whole pitch was there are two million members nationwide and because of this size membership they can get in there and work for you with this insurance company to keep prices down," Mr. Cruse says. "It was like an angel knocked on my door."

Timothy R. Adams, the Kansas agent who sold Mr. Cruse his policy, says he quit selling UICI insurance in November 2000 because so many of his customers complained, primarily about nonpayment of claims. "There were a lot of times I didn't understand what I was selling," Mr. Adams says.

Mr. Adams says that he does not recall telling customers that NASE had two million members. NASE President Robert Hughes, a Dallas accountant, says the group has about 250,000 members. But two insurance agents in Laguna Hills, Calif., claimed until recently on their Web site that NASE had 2.5 million members.

UICI said it tries to deal promptly with agents who "may say and do things with which we may disagree."

**An Extra Source of Revenue**

Policyholders often pay a steep price to gain access to an association policy. Consumers are frequently required to pay hundreds of dollars in one-time enrollment fees and monthly dues to join the association -- on top of their insurance premiums.

In some instances, a large share of this association money winds up in the pockets of insurance agents and other industry insiders close to these nonprofit groups, according to a review of tax filings and court records, as well

as interviews with regulators and agents.

Members of the National Association for the Self-Employed pay anywhere from $96 to $540 for membership packages. Those purchasing insurance must also pay a one-time fee of $120 to NASE. The National Business Association's dues run between $180 and $420 a year.

In the suit filed by policyholders in Texas against the National Business Association, plaintiffs contend that Mr. Firebaugh, the insurance agency owner, has transferred millions of dollars in dues and enrollment fees from the nonprofit group to companies he controls. Half to two-thirds of the association's dues are paid to Mr. Firebaugh's insurance agency and his agents for enrolling members, according to a marketing agreement signed last year by Mr. Archibald, of the NBA, and an insurance-agency representative. In 2000, according to financial records filed with the court, the National Business Association had revenue of $6 million and paid $4.2 million of that to Mr. Firebaugh's insurance agency as "management/marketing fees."

Mr. Firebaugh declined to comment on those payments. He denies profiting improperly from the sale of association policies.

NASE gives roughly half of its first-year membership dues to insurance agents for enrolling members, says Mr. Hughes, the association's president. He says the association's management firm, which handles mailings, member calls and other daily operations, is paid a per-member fee, which he declined to disclose. The firm, Specialized Association Services Inc., was founded by Ronald Jensen, UICI's chairman, in the 1980s and later sold to Jeffrey Jensen, his son.

Mr. Hughes says Jeffrey Jensen is responsible for reviewing the performance of his father's insurance company and determining whether there are better policies available. Mr. Hughes says the father-son relationship does not pose a conflict of interest. "We view ourselves as having an arm's-length relationship with all of our vendors," Mr. Hughes says.

Ronald Jensen says critics of association coverage are too "worried about form over substance."

**Write to** Chad Terhune at chad.terhune@wsj.com[1]

URL for this article:
http://online.wsj.com/article/0,,SB1037832962420916908.djm,00.html

Hyperlinks in this Article:
(1) mailto:chad.terhune@wsj.com
(2) http://online.wsj.com/home/health
(3) http://online.wsj.com/user-cgi-bin/searchUser.pl?action=emailalert

*Updated November 21, 2002*

Copyright 2002 Dow Jones & Company, Inc. All Rights Reserved

Printing, distribution, and use of this material is governed by your Subscription agreement and Copyright laws.

For information about subscribing go to http://www.wsj.com

**24**

# UNITED STATES DISTRICT COURT

## Northern District of Texas

Home | Directories | Rules | Court Records | Forms | Publications | Filing Info | Jury Info | Judges | Links | Employment | FAQ | About Us

## Judges - District Judge Sidney A. Fitzwater

Search: [    ] GO

**Fish** | **Robinson** | **Buchmeyer** | **Fitzwater** | **Cummings** | **McBryde** | **Solis**
**Means** | **Lindsay** | **Lynn** | **Godbey** | **Kinkeade** | **Sanders** | **Maloney**

**Biography** | **Requirements** | **Opinions** | **Notable Case** | **General Information**

### General Information

1100 Commerce Street
Room 1520
Dallas, Texas 75242-1003

Courtroom 1516

Chambers: 214-753-2333
Judicial Assistant: Debra Eubank
Courtroom Deputy: Pat Esquivel - 214-753-2336
Court Reporter: Pamela Wilson - 214-741-3537

Case Letter Designation: (D)

| BIOGRAPHY | |
|---|---|
| **Birth:** | 1953 |
| **Year Service Began:** | 1986 |
| **Appointed by:** | President Ronald Reagan |
| **Education:** | Baylor University 1975 BA, Baylor University School of Law 1976 JD |
| **Legal Practice:** | Associate, Vinson & Elkins, Houston 1976 - 1978; Associate, Rain Harrell Emery Young & Doke 1978 - 1982 |
| **Judicial:** | Judge, 298th Judicial District, Dallas County, Texas 1982 - 1986 |
| **Current Memberships:** | State Bar of Texas, Dallas Bar Association, Texas Bar Foundation (Life Fellow), Federal Judges Association, District Judges Association of the Fifth Circuit, and Committee on Rules of Practice and Procedure of the Judicial Conference of the United States |

**Memorandum Opinion Orders**

**EXHIBIT 24**

| Case Number - Civil | Style | Document No. | Pages | Date Entered |
|---|---|---|---|---|
| 3:00-mc-101 | In Re Paul F. McTighe, Jr. | 10 | 7 | 02/13/01 |
| 3:99-cv-2862 | Jinks v. Advanced | 21 | 13 | 04/04/01 |

|  |  |  |  |  |
|---|---|---|---|---|
|  | Protection Systems, Inc. |  |  |  |
| 3:99-cv-1009 | McKinney v. Texas Dept of Transportation | 54 | 15 | 04/17/01 |
| 3:00-cv-1161 | In Re Tomlin | 22 | 7 | 09/07/01 |
| 3:00-cv-0913 | Barrow v. Greenville IDS | 112 | 8 | 09/18/01 |
| 3:01-cr-264 | U.S. v. Hernandez-Rodriquez | 20 | 8 | 11/02/01 |
| 3:00-cv-2126 | Dethrow v. Parkland | 31 | 4 | 11/14/01 |
| 3:01-cv-1516 | Bank One v. Euro-Alamo Investments | 29 | 6 | 01/18/02 |
| 3:02-mc-036 | In Re Robert R. Wightman-Cervantes | 18 | 11 | 11/14/02 |

Citation   Found Document   Rank(R) 1 of 1   Database
SIDNEY A. FITZWATER                        AFJ

Almanac of the Federal Judiciary

Copyright (c) 2002 by Aspen Law & Business

FIFTH CIRCUIT
NORTHERN DISTRICT OF TEXAS

SIDNEY A. FITZWATER

District Judge; Texas, Northern
15A3 United States Courthouse
1100 Commerce Street
Dallas, TX 75242
Born 1953; appointed in 1986 by President Reagan

EDUCATION: San Antonio College, 1972; Baylor Univ., B.A., 1975, J.D., 1976

PRIVATE PRACTICE: Vinson & Elkins, Houston, 1976-78; Rain Harrell Emery Young & Doke, 1978-82

GOVERNMENT POSITIONS: Intern, Law Enforcement Assistance Administration, 1975; Texas District Attorney's Office, 1975-76

OTHER EMPLOYMENT: Management Development Insitute, Inc., (Vice President, 1977-80; General Counsel, 1977-82; Secretary, 1977-84), San Antonio, Tex., 1977-84

PREVIOUS JUDICIAL POSITIONS: Judge, District Court, Texas, 1982-85

PROFESSIONAL ASSOCIATIONS: A.B.A.; State Bar of Texas; Texas Bar Foundation; Dallas Bar Assn.; Dallas Assn. of Young Lawyers; Houston Bar Assn.; Houston Assn. of Young Lawyers

POLITICAL ACTIVITIES: Executive Committee, Dallas County Republican Party, 1981-82; Executive Committee, Texas Federation of Young Republicans, 1981-82; Director, Dallas County Republican Men's Club, 1984-85

OTHER ACTIVITIES: Director, Dallas Services for Visually Impaired Children, Inc., 1980-85; Trustee/Director, Lakehill Preparatory School, 1984-85

HONORS & AWARDS: National Order of Barristers; Omicron Delta Kappa

PUBLICATIONS: Book: (With Ivan W. Fitzwater and Peggy A. Frias) SCHOOL LAW SIMPLIFIED : A PRIMER FOR TEACHERS, COUNSELORS AND ADMINISTRATORS (1980)
    Articles: Public Utility Commission: Appellate Procedure and Judicial Review, 28 BAYLOR L. REV. 1001 (1976); Reexamining the Special Exception, 37 SW. L.J. 789 (1983); Settlements Requiring the Court's Approval,TEX. TRIAL LAW. (March 1985); Dedication; John R. Wilson, 38 BAYLOR L. REV. (1986)

NOTEWORTHY RULINGS: 1990: Presided over an age-discrimination suit filed by a former Xerox employee who claimed that the company asked her to relocate, but

Copr. (C) West 2003 No Claim to Orig. U.S. Govt. Works



SIDNEY A. FITZWATER

then did not give her the promised position. The jury awarded the plaintiff $9 million. Inside Litigation, February 1990.

1991: Ruled the FDIC cannot assert special powers in bankruptcy proceedings to recoup losses on loans that were fraudulently obtained. Fitzwater acknowledged the ruling could encourage other borrowers who obtained loans fraudulently to seek bankruptcy court protection, but said that Congress must remedy the problem, not the court. FDIC v. James W. Smith II, CA3-90-2488-D

1995: Fitzwater granted summary judgment to SBC Communications Inc., allowing the company to provide cable television service within the area of its local phone subsidiary. Fitzwater ruled that the provisions of the 1984 Cable Act barring companies from offering cable in places where they also offered local telephone service were unconstitutional. New York Times, March 30, 1995.

BAR ASSOCIATION EVALUATIONS: Fitzwater received a 94% overall performance approval rating in a judicial evaluation poll conducted by the Dallas Bar Association in 2001.
2002 WL 32051706
END OF DOCUMENT

Copr. (C) West 2003 No Claim to Orig. U.S. Govt. Works

Westlaw.

# TOWARD A RENAISSANCE OF PROFESSIONALISM IN TRIAL ADVOCACY*

*by Judge Sidney A. Fitzwater***

## I.

The American civil justice system must experience a renaissance of professionalism in trial advocacy so that a system designed to ensure justice will not become a contrivance to deny it. This does not suggest a fundamental restructuring of the means by which civil litigants seek justice. "[A] common law trial," as Justice Jackson has written, "is and always should be an adversary proceeding."[1] The system has evolved from Norman trial by battle. Attributes of ardent conflict inevitably inhere within it.

The call for a rebirth of professionalism is premised instead upon the recognition that uncivil and discourteous trial advocacy must be eliminated so that justice will not be denied either by reason of excessive cost or unjustified delay. With exceptions, American civil litigants are responsible for the fees of their own solicitors. Justice is denied when it can be secured only at a price that exceeds what a litigant can afford. Moreover, justice is not achieved in its pursuit but in the final pronouncement of the chancellor's judgment. While life is said to be a journey rather than a destination, justice is found in attainment, not struggle.

These two premises served as the rationale for one court to adopt rules aimed at curbing inaffable litigation conduct. Sitting en banc, the United States District Court for the Northern District of Texas, in *Dondi Properties Corp. v. Commerce Savings & Loan*

---

\* A modified version of this paper was presented at Texas Tech University School of Law on March 9, 1989 as part of the Halbert O. Woodward Lecture Series.

\*\* United States District Judge for the Northern District of Texas, Dallas, Texas; B.A., J.D., Baylor University.

1. Hickman v. Taylor, 329 U.S. 495, 516 (1947) (Jackson, J., concurring).

787

EXHIBIT 25

*Association*,[2] adopted standards[3] intended to restore civility to civil litigation. The canons are not restricted to trial conduct alone, for litigation today encompasses far more pretrial discovery and preliminary procedures than it does the actual trial of cases. The guidelines are intended to lower costs and reduce delay by focusing litigation activities upon merits resolution. The regulations attempt to accomplish these goals by curbing collateral skirmishes prompted by behavior that ranges from benign incivility to outright obstruction.

The *Dondi* court did not attempt to espouse novel principles. For example, the seventh standard adopted — that ill feeling between clients should not influence a lawyer's conduct, attitude, or demeanor towards opposing counsel—has been recognized since at least the turn of the century. In his 1910 book *Ethical Obligations of the Lawyer*,[4] Dean Archer of the Suffolk Law School cited Canon 17 of the American Bar Association Code of Ethics to support the argument that one lawyer should not abuse a fellow attorney "for mere effect."[5] Canon 17 is, in terms,[6] substantially similar to the seventh guideline adopted in *Dondi*. The court instead assigned values to the scarce resources that provision the justice system and decreed standards designed to better use these resources. No court of law should countenance the outright denial of justice. The United States District Court for the Northern District of Texas sought to prevent indirectly what the law should not condone directly.

The *Dondi* court recognized that attorney and judicial time are commodities that are not to be wasted. Attorney time has value because litigants compensate their own attorneys. When a lawyer

---

2.  121 F.R.D. 284 (N.D. Tex. 1988) (en banc).

3.  The standards adopted by the court are set forth *infra* at note 30 and at 121 F.R.D. at 287-88.

4.  G. ARCHER, ETHICAL OBLIGATIONS OF THE LAWYER (reprinted 1981, Fred B. Rothman & Co., Littleton, Colo.) (1st ed. 1910, Little, Brown, & Co., Boston).

5.  *Id.* at 164-65.

6.  American Bar Association Code of Ethics, Canon 17 (*reprinted in* G. ARCHER, *supra* note 4, at 165-66):

> Clients, not lawyers, are the litigants. Whatever may be the ill-feeling existing between clients, it should not be allowed to influence counsel in their conduct and demeanor toward each other or toward suitors in the case. All personalities between counsel should be scrupulously avoided. In the trial of a cause it is indecent to allude to the personal history or the personal peculiarities and idiosyncrasies of counsel on the other side. Personal colloquies between counsel, which cause delay and promote unseemly wrangling, should also be carefully avoided.

*Id.*

renders unnecessary services it heightens the likelihood that the costs
to deserving litigants will become excessive. This, in turn, limits
access to civil justice to the affluent. Judicial time has value because
it must be allotted among litigants who, in an overburdened justice
system, must compete for their day in court. When a judge is called
upon to devote attention to one case, other civil litigants are neces-
sarily deprived of an audience. When a judge must decide a dispute
whose resolution is unlikely to advance a case to ultimate disposition,
justice is correspondingly denied to deserving litigants by unjustifiable
delay.

Courts cannot alone counter the ill effects of litigation tactics
and trial advocacy practices that contribute to waste and injustice.
As law professors or lawyer-role models, you who study law today
will teach law well into the next century. Your efforts to curb surly
behavior will be vital. Moreover, no worthy renaissance of culture
or philosophy comes to fruition overnight. Now is the time for
students of the law to learn by precept what they will later contribute
by practice.

## II.

Those whose legal careers are of sufficient length to give them
the perspective of time observe that today's advocacy is marked by
attorney acrimony. They note the proliferation of litigation tactics
that are characterized as "hardball,"[7] "Rambo-like actions,"[8] "com-
posed of uncivil, discourteous, combative, harassing and rude be-
havior."[9] *The New York Times* reports that "practitioners talk of
'scorched earth' or 'taking no prisoners' or 'giving no quarter' in
advocating a client's cause."[10] The president of one metropolitan bar
association is quoted as saying that the courtroom ethic has become
"litigation is war, the lawyer is a gladiator, and the object is to wipe
out the other side."[11] These tactics, now described pejoratively,
include

> unnecessary contentions directed at the party opponent and his
> attorney to promote motions, hearings, discovery and animosity

---

7.  Dallas Times Herald, July 15, 1988, at 1, col. 1.
8.  *Attack on Rambo: Bar Courtesy Codes Spread*, A.B.A. Bar Leader, (Nov. - Dec.
1988), at 11.
9.  *Id.*
10.  The New York Times (National ed.), Aug. 5, 1988, at 21, col. 1.
11.  *Id.* (quoting Marvin Earp, Esq., president of the Cleveland, Ohio Bar Association).

. . . [and] . . . sharp practices such as using hypertechnical definitions of words used in discovery requests as a method for withholding obviously discoverable information, refusing to come to any agreements with opposing counsel concerning discovery and other matters, no matter how trivial, and scheduling depositions and hearings at times he knows are terribly inconvenient for opposing counsel and his client.[12]

Such stratagems have not drawn universal censure from those who might be expected to offer reproof. Instead, writes University of Texas Law School Professor Alex Wilson Albright:

Lawyers who employ these abusive tactics successfully receive tremendous amounts of publicity. . . . They develop a reputation for being "tough," exactly what many clients engaged in bitter business disputes want. They make a great deal of money. In the competitive business climate that the law practice has become, more and more attorneys are tempted to use abusive tactics to attract clients to keep them happy.

Young lawyers, untutored in the professional traditions of civility, may be impressed by the conduct exhibited by their seemingly successful peers, and not surprisingly, they may begin to emulate it. Every shouting match and refusal to agree with another lawyer is seen by the young lawyer as another instance in which he has succeeded in the macho environment of the successful trial lawyer.[13]

Professor Albright poses the obvious question:

What has happened to the "gentleman" trial lawyer of the past, like Atticus Finch in Harper Lee's *To Kill a Mockingbird*, who walked arm in arm with his opposing attorney after a long day of a very emotional trial? Today it appears that trial lawyers don't even speak civilly to each other. From the time the suit is filed, they often harbor such animosity toward each other that they speak as little as possible thereafter — even after the case is over.[14]

When the president of the Dallas Bar Association was asked to comment on the Bar's recently adopted guidelines of conduct, he responded: "These are forms of courtesy that were not needed until the bar got so large that it was an impersonal kind of relationship."[15]

---

12.  Albright, *Waging Unconditional Warfare: An Exasperated Court Speaks its Mind*, Texas Lawyer, Sept. 5, 1988, at 18, col. 1.

13.  *Id.* at 19, col. 2.

14.  *Id.* at 18, col. 1.

15.  *Good Manners Mandated: Texas Federal Court Adopts Standards of Conduct, Inci-*

The structure in which law is now practiced may have prompted the need for codes of civility.

> Approximately two-thirds of the bar, including 95% of recent-entrants, now work within organizations of some sort, and perform the bulk of their services for entities rather than individuals. In a substantial amount of legal practice, "the client" is not the "person with a problem" traditionally depicted in legal literature, but an organization with indeterminate or potentially conflicting interests. So too, the attorney often is not an independent moral agent but an employee with circumscribed responsibility, organizational loyalty, and attenuated client contact.
>
> Under such circumstances, professional ideals that presuppose personal autonomy and public responsibilities may prove difficult to reconcile with the internal dynamics of employing institutions.[16]

Law firms are becoming institutions with identities akin to those of competitive teams. The name of the firm—not the individual lawyer—is imprinted on the briefcase that is carried to trial or deposition. Lawyers with other firms are not regarded as professional colleagues but as members of an opposing team.

Still others posit that the trial lawyer's instinct to compete against a fellow lawyer is not triggered by parochial identity; they argue that lawyers today frequently view the practice of law not as a profession but as a business. The other lawyer is not regarded as a co-member of one's profession but as a competitor for one's clients. "As the profession's competitive ethos and partisan loyalties grow more pronounced, the pretense that the bar remains above trade becomes more difficult to accept."[17] Moreover, contention triggers the rendition of legal services that are billed to fee-paying clients. Under this view the practice of law is seen as a profit generating machine that thrives upon adversity. Innumerable commentators[18] note that "profit dynamics are a major cause of procedural incivilities."[19] "The hourly fee structure of most private practice encourages production of any services for which parties are willing and able to pay."[20]

---

*vility and Obstructionism Outlawed*, 14 Litigation News 1, 7 (American Bar Association Section of Litigation) (Dec. 1988) [hereinafter Litigation News].

16. Rhode, *Ethical Perspectives on Legal Practice*, 37 STAN. L. REV. 589, 590 (1985).

17. *Id*. at 592.

18. *Id*. at 635 (citing commentators).

19. *Id*. (footnote omitted).

20. *Id*. at 634.

It is arguable that some incivility is the inevitable consequence of the high degree of ethical commitment that runs from lawyer to client. Canon 7 of the Texas Code of Professional Responsibility admonishes each attorney to "represent a client zealously within the bounds of the law."[21] There is, to be sure, some measure of tension between an attorney's duty to represent the client zealously and the concomitant obligation to act professionally with an acceptable amount of civility. Intellectual honesty requires, however, that one remove from the category of fervid representation those tactics that cannot claim obedience to an ethical canon.

An attorney's obligation to a client does not require promoting unnecessary contention, evasion, harassment, or delay. One need not participate in litigation pathologies such as "endless wrangling over peripheral issues, as well as over-and under-production of discoverable material . . . casuistic constructions of discovery requests, disingenuous assertions of the attorney-client privilege, or 'Hiroshima' responses to document demands (with any damaging items buried in a mass of trivia)."[22] A lawyer should not—under the guise of obligatory professional ardor—engage in uncivil conduct to facilitate self-interest or for lack of self-discipline. Nor should such conduct be excused because the Bar has become impersonal, law firm structures have altered the dynamics of the practice of law, or the legal profession has been affected by the pressures of competition.

Moreover, the conduct of a lawyer that can legitimately be attributed to the duty of zealous advocacy need not perforce lack civility. The obligation to represent a client with fervor is expressly tempered by the admonition that such representation be "within the bounds of the law."[23] The Ethical Considerations of the Code make clear that the duty of zealous advocacy does not militate against the concurrent obligation "to treat with consideration all persons involved in the legal process and to avoid the infliction of needless harm."[24] An attorney is not obligated to "engage in . . . conduct

---

21. SUPREME COURT OF TEXAS, RULES GOVERNING THE STATE BAR OF TEXAS art. X, § 9 (Code of Professional Responsibility) Canon 7 (1973) [hereinafter TEXAS CODE OF PROFESSIONAL RESPONSIBILITY].

22. Rhode, *supra* note 16, at 597 (footnote omitted).

23. TEXAS CODE OF PROFESSIONAL RESPONSIBILITY, *supra* note 21, Canon 7.

24. STATE BAR OF TEXAS, ETHICAL CONSIDERATIONS ON CODE OF PROFESSIONAL RESPONSIBILITY EC 7-10 (1972).

that offends the dignity and decorum of [judicial] proceedings;"[25] the Ethical Considerations caution counsel that ill feelings between clients should not influence one lawyer's conduct, attitude, and demeanor towards opposing lawyers.[26] Within the bounds of zealous advocacy, an attorney may nevertheless extend courtesies to opposing counsel and accede to reasonable requests. Ethical Consideration 7-39 recognizes that zealous advocacy, on the one hand, and courtesy and civility, on the other hand, are not mutually exclusive:

> In the final analysis, proper functioning of the adversary system depends upon cooperation between lawyers and tribunals in utilizing procedures which will preserve the impartiality of the tribunal and make their decisional processes prompt and just, without impinging upon the obligation of the lawyer to represent his client zealously within the framework of the law.[27]

The United States District Court for the Northern District of Texas determined that the elimination of malfeasant litigation conduct would not flow inexorably from the good intentions of the organized Bar. The court implicitly recognized that, "Where a threat of formal sanctions is remote, as is generally the case in professional contexts, the most significant function of official codes will be symbolic and pedagogic."[28] So the court adopted standards of litigation conduct but coupled them with the coercive teeth that a body of judges can effectively impose.

The eleven regulations are fashioned from the Dallas Bar Association's "Guidelines of Professional Courtesy" and "Lawyer's Creed," both adopted in 1987.[29] The court found these guidelines to be sensible and pertinent to the problems it was addressing; it saw no need to create anew what the organized Bar had thoughtfully done. The standards require that lawyers: be conscious of a broader duty to the judicial system; show candor, diligence, and utmost respect to the judiciary; show courtesy and cooperation to opposing counsel; display personal dignity and professional integrity; treat fellow lawyers, the opposing party, the court, and members of the

---

25. *Id.*, EC 7-36.
26. *Id.*, EC 7-37.
27. *Id.*, EC 7-39.
28. Rhode, *supra* note 16, at 647.
29. The guidelines and creed are reprinted, in pertinent part, as an appendix to the *Dondi* opinion. *See* Dondi Props. Corp. v. Commerce Sav. & Loan Ass'n, 121 F.R.D. 284, 292-95 (N.D. Tex. 1988) (en banc).

*TEXAS TECH LAW REVIEW* [Vol. 20:787

court staff with courtesy and civility and conduct themselves in a professional manner; treat adverse witnesses and suitors with fairness and due consideration; prevent the ill feelings of clients from influencing their feelings towards opposing lawyers; not use discovery or the scheduling of discovery to harass opposing counsel or counsel's client; be punctual; consent to just requests for cooperation; and avoid antagonistic or obnoxious behavior.[30]

These standards became more than mere desiderata when the court opted to impose sanctions for their violation. The penalties range from "a warm friendly discussion on the record" to "a hard-nosed reprimand in open court" to "compulsory legal education" to "monetary sanctions, or other measures appropriate to the circumstances."[31]

---

30. The guidelines state in full:

(A) In fulfilling his or her primary duty to the client, a lawyer must be ever conscious of the broader duty to the judicial system that serves both attorney and client.

(B) A lawyer owes, to the judiciary, candor, diligence and utmost respect.

(C) A lawyer owes, to opposing counsel, a duty of courtesy and cooperation, the observance of which is necessary for the efficient administration of our system of justice and the respect of the public it serves.

(D) A lawyer unquestionably owes, to the administration of justice, the fundamental duties of personal dignity and professional integrity.

(E) Lawyers should treat each other, the opposing party, the court, and members of the court staff with courtesy and civility and conduct themselves in a professional manner at all times.

(F) A client has no right to demand that counsel abuse the opposite party or indulge in offensive conduct. A lawyer shall always treat adverse witnesses and suitors with fairness and due consideration.

(G) In adversary proceedings, clients are litigants and though ill feeling may exist between clients, such ill feeling should not influence a lawyer's conduct, attitude, or demeanor towards opposing lawyers.

(H) A lawyer should not use any form of discovery, or the scheduling of discovery, as a means of harassing opposing counsel or counsel's client.

(I) Lawyers will be punctual in communications with others and in honoring scheduled appearances, and will recognize that neglect and tardiness are demeaning to the lawyer and to the judicial system.

(J) If a fellow member of the Bar makes a just request for cooperation, or seeks scheduling accommodation, a lawyer will not arbitrarily or unreasonably withhold consent.

(K) Effective advocacy does not require antagonistic or obnoxious behavior and members of the Bar will adhere to the higher standard of conduct which judges, lawyers, clients, and the public may rightfully expect.

*Id.* at 287-88.

31. *Id.* at 288 (adopting range of sanctions specified by the Fifth Circuit in Thomas v. Capital Sec. Servs., Inc., 836 F.2d 866, 878 (5th Cir. 1988) (en banc), for violations of FED. R. CIV. P. 11).

Although standards without teeth may lack a coercive bite, there is worth to be found in a court's articulating its vision of the optimum justice system. Lawyers are accustomed to looking to the courts for precedent on matters of substantive law. It is surely appropriate for the Bench to guide the Bar on matters of professional responsibility by describing the behavior it thinks ethical. Furthermore, there is a view that the quality of the work of the Bench sets a standard for the product of the Bar. If so, then an opinion such as *Dondi*, which is "effective through its symbolism and teaching, in addition to the sanctions imposed for violations,"[32] should be seen as a rising tide that raises all boats.

More important than a court's capacity to shape opinion, however, is the practical reality that the judiciary cannot devote extensive attention to enforcing ethical standards. The *Dondi* opinion recognizes that decreeing standards and threatening sanctions is not intended to engender satellite litigation. In order that guidelines of civility will not defeat the very purposes for which they are promulgated, courts must look to the legal profession to exercise the police power through self-regulation. The following attributes of professionalism should be embraced in order to further that self-direction.

Lawyers should develop an attitude of civility. If a gentle answer turns away wrath,[33] a civil frame of mind will surely quiet the surliest opponent. One's proclivity must be to demonstrate genuine respect for fellow members of the Bar. Mutually courteous conduct between court officers should be considered the norm and incivility should be rejected as dishonorable.

Practitioners must possess a consciousness of how litigation costs impact upon the pursuit of justice. No lawyer should attempt to generate income by rendering unneeded services. But attorneys must also recognize that unnecessary legal costs—for whatever reason incurred—can deprive deserving civil litigants of the services of a trained professional. In addition to the indigent, members of the middle class and owners of small businesses may also feel the pinch —neither able to afford counsel nor to qualify for *pro bono* legal services.

Attorneys must focus upon the destructive effects of delay. Irreparable injury can be sustained not only in the absence of

---

32. Albright, *supra* note 12, at 19, col. 4.
33. *See Proverbs* 15:1 (New American Standard Version).

immediate equitable relief; it can similarly flow from the rendition of judgments that are so attenuated by the passage of time that they lose their character of righting a contemporaneous wrong. The Bar must recognize that proceedings that do not advance the resolution of the merits of a civil action inevitably delay another litigant's day in court.

Lawyers must make good faith efforts to resolve, between themselves, perceived transgressions of incivility. If one hallmark of a profession is self-regulation, then a learned profession such as law must extend the private ordering of its members' conduct to the area of trial advocacy. The status of the lawyer as a professional is diminished when members of the Bar are thought incapable of resolving acts of incivility through reason and mutual understanding.

Trial advocates must reemphasize the "counselor at law" role of the profession. To advise a client does not mean to do the client's bidding while blindfolded to the larger consequences. "Instrumentalism" is a "view of the lawyer as a technician in service of a client-principal . . . ."[34] The lawyer is considered to be merely a surrogate who executes the client's will. I agree with the proposition that "the lawyer cannot avoid being a party to the client's decision."[35] The trial lawyer who acts as a counselor, as well as an advocate, will not accede to a client's disingenuous or untutored perspective of how litigation is to be conducted. This lawyer will instead possess the integrity and fortitude to advise the client that unprofessional tactics are inappropriate and will decline to undertake them.

In a similar vein, attorneys must embrace the philosophy that litigation is to be employed in the pursuit of justice, not for nugatory purposes. There are reports of lawsuits and counterclaims instituted not to procure the just and fair resolution of a dispute but to delay a business transaction, drive a competitor into bankruptcy, or obtain a nuisance settlement. These illegitimate uses of the adversary system inevitably place unjustified and disproportionate burdens upon the time and resources of judges and other officers of the court.

Finally, and perhaps incorporating all the foregoing attributes, attorneys must strive for an understanding of their larger responsibility to the entire justice system. The first guideline adopted in *Dondi* mandates that each lawyer "be conscious of the broader duty

---

34. Lehman, *The Pursuit of a Client's Interest*, 77 MICH. L. REV. 1078, 1079 (1979).
35. *Id.* at 1080.

to the judicial system that serves both attorney and client.'' If equal justice under law is to be more than a hollow promise, the Bar must develop a pellucid sense of what it means to use the courts responsibly. When litigants invoke the aid of a court to mediate a dispute that will not advance the merits determination of a case—or, worse yet, to referee litigation whose purpose is unrelated to the pursuit of justice—the courts must inevitably delay reaching the claims of an injured worker or a victim of discrimination. A narrow view of litigation disregards the broader impact of dilatory and unfair tactics. The more enlightened perspective enables one to see that depleted stores cannot be devoted to other concerns and that expending irreplaceable judicial resources on unworthy matters is like casting pearls before swine.[36]

These lessons must first be taught to law students, then reinforced with new lawyers and revisited with experienced advocates. The law schools must expand their curricula to include more than the two-hour pass-fail course on professional responsibility taught when I was a student. The subject of legal ethics must not be confined to one class but should be emphasized hand-in-hand with the substantive portions of all course work. The study of civil procedure, for example, should include not only an analysis of the rules but of how they ethically are to be used. Students must be afforded a more complete perspective of the adversary system in order to understand how their individual conduct will impact upon the entire administration of justice.

The emphasis upon professional ethics must not end in the rigorous intellectual environment of the law school. Bar associations, law firms, and experienced attorneys have a duty to reinforce with new lawyers the obligations of the profession. Whether in the form of bar association seminars, firm luncheons, or role modeling, seasoned practitioners can and should direct the behavior patterns of impressionable young lawyers toward rigid adherence to the ethical obligations of the profession.

Some of my early notions of professional conduct were formulated under the tutelage of Morris Harrell, who later served as president of the American Bar Association and the American College of Trial Lawyers, and whose views on professionalism are well-

---

36. *See Matthew* 7:6 (New American Standard Version).

*TEXAS TECH LAW REVIEW* [Vol. 20:787

known[37] and widely regarded. By the way he conducted himself, he made plain his sense of what was upright and ethical, and his young colleagues eagerly emulated what they observed in him.

By faithfully adhering to ethical standards in their conduct, experienced litigators can unquestionably shape the behavior patterns of their novice colleagues. But the lessons of civility and courtesy must also be reviewed by experienced advocates so as not themselves to succumb to the temptations of client pressure, competition, or lack of self-discipline. The hoary lawyer's instinctive or cultivated dedication to professionalism can then be reinforced in various ways, including participation in Inns of Court, attendance at professional seminars, or rigorous self-study.

### III.

In prescribing sanctions for errant ligitation conduct, the *Dondi* court drew certain parallels to Federal Rule of Civil Procedure 11. In so doing, the court warned that it did not intend to engender the kind of satellite litigation it had seen in the context of that rule.[38] Any attempt to restore professionalism to trial advocacy must address the lawyer's obligation to invoke rule 11 responsibly.

Prior to 1983, rule 11 provided that the signature of an attorney on a pleading constituted a certificate that the attorney had read the pleading, that to the best of the attorney's knowledge, information, and belief there was good ground to support it, and that it was not interposed for delay. An errant pleading would be stricken and—for a wilful violation—an attorney could be subjected to "appropriate disciplinary action."[39] The optional nature of rule 11 deprived the

---

37. *See, e.g.*, Harrell, *Preserving Professionalism*, 69 A.B.A. J. 864 (1983).

38. Dondi Props. Corp. v. Commerce Sav. & Loan Ass'n, 121 F.R.D. 284, 288 (N.D. Tex. 1988) (en banc) ("We do not, by adopting these standards, invite satellite litigation of the kind we now see in the context of FED. R. CIV. P. 11 motions.").

39. FED. R. CIV. P. 11 provided in its pre-amended form:

The signature of an attorney constitutes a certificate by him that he has read the pleading; that to the best of his knowledge, information, and belief there is good ground to support it; and that it is not interposed for delay. If a pleading is not signed or is signed with intent to defeat the purpose of this rule, it may be stricken as sham and false and the action may proceed as though the pleading had not been served. For a wilful violation of this rule an attorney may be subjected to appropriate disciplinary action.

Reprinted in Thomas v. Capitol Sec. Servs., Inc., 836 F.2d 866, 869-70 n.1 (5th Cir. 1988) (en banc).

courts of the incentive to use it. The rule was thus rarely applied prior to 1983.[40]

"Growing concern over misuse and abuse of the litigation process prompted rulemakers to amend rule 11 in 1983 to reduce the reluctance of courts to impose sanctions by emphasizing the responsibilities of attorneys and reinforcing those obligations through the imposition of sanctions."[41] The amended rule 11[42] contains important differences from its predecessor. Not only is the imposition of sanctions mandatory,[43] but the amended rule expressly authorizes the awarding of attorney's fees.[44] The alluring potential of recompense for one's attorney's fees has become a tempting carrot for the litigious horse. This is especially so in the case of defendants who, pursuant to the American Rule, usually pay their own attorney's fees, even when defending a patently frivolous suit.

Predictably, motions requesting rule 11 sanctions have been filed in unprecedented numbers. One measure of the explosion is found in the number of published opinions on the subject. Between 1938 and 1976, rule 11 motions were filed in only nineteen reported cases.[45] Among those cases, violations were found in eleven instances, and

---

40. *Id.* ("Despite its laudable goals, Rule 11 was rarely applied before its amendment in 1983.").

41. *Id.* at 870.

42. In its amended form (the rule was further revised in 1987 in a nonsubstantive manner) the rule provides, in pertinent part:

> Every pleading, motion, and other paper of a party represented by an attorney shall be signed by at least one attorney of record in the attorney's individual name, whose address shall be stated . . . . The signature of an attorney or party constitutes a certificate by the signer that the signer has read the pleading, motion, or other paper; that to the best of the signer's knowledge, information, and belief formed after reasonable inquiry it is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law, and that it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation . . . . If a pleading, motion, or other paper is signed in violation of this rule, the court, upon motion or upon its own initiative, shall impose upon the person who signed it, a represented party, or both, an appropriate sanction, which may include an order to pay to the other party or parties the amount of the reasonable expenses incurred because of the filing of the pleading, motion, or other paper, including a reasonable attorney's fee.

43. 836 F.2d at 869.

44. *Id.* at 870.

45. *Id.* at 876 n.14 (citing S. Kassin, *An Empirical Study of Rule 11 Sanctions* (Fed. Jud. Center 1985)).

attorneys sanctioned in only three.[46] For the period 1976 through 1979, there was one additional reported opinion in which a sanction was imposed pursuant to rule 11.[47] By contrast, following the 1983 amendment to the rule, between August 1, 1983 and August 1, 1985 —a period of only two years—there were more than two hundred reported cases involving rule 11 sanctions.[48] The marked proliferation of rule 11 motions has been described by the co-chairman of the American Bar Association's Professional Responsibility Committee as "Rule 11 craziness."[49]

Valid rule 11 motions, of course, are not encompassed within the scope of my remarks. The Supreme Court of the United States promulgated the rule and Congress did not abrogate it. When invoked for a legitimate reason, rule 11 serves a salutary purpose. But when such a motion is improperly instigated, it falls within the reach of unprofessional conduct that is to be condemned.

In a very real sense, unsubstantiated rule 11 motions are more insidious than are other tactics because they facially bear the imprimatur of a rule of civil procedure. When such a motion, or even the threat of such a motion, is itself interposed for tactical advantage, the litigator's animus is not as discernible as is rude conduct at a deposition or the tortured construction of terms to avoid legitimate discovery. Perhaps due to its potential for fee-shifting that is not otherwise possible, or because of its susceptibility to misuse as a disingenuous device of obstruction, rule 11 has generated collateral disputes of unprecedented—and perhaps unanticipated—magnitude.

Like the pathologies of incivility and discourtesy, the misuse of rule 11 must be seen in a larger sense. Practitioners should recognize that unfounded rule 11 motions must be ruled upon and that district courts are required to give the motions sufficient attention to facilitate appellate review.[50] This likewise diminishes available resources and gives rise to the dual evils of delay and excessive cost.

A rule 11 motion is not to be placed in one's word processor and generated in response to every suit, defense, or opponent's

---

46.  *Id.*
47.  *Id.*
48.  *Id.* (citing Nelken, *Sanctions Under Amended Rule 11 — Some "Chilling" Problems in the Struggle Between Compensation and Punishment*, 74 Geo. L. J. 1313, 1326 (1986)).
49.  Litigation News, *supra* note 15, at 7.
50.  *See* 836 F.2d at 882-83.

Case MDL No. 1578   Document 1   Filed 09/30/03   Page 90 of 108

motion. Unfounded requests for sanctions that accuse the opposing lawyer of filing a claim or defense that is not based upon an adequate investigation of the facts or analysis of the law can trigger an instinctive reaction in the adversary to launch a retaliatory strike. Relations between opposing counsel predictably degenerate, and agreements that would otherwise be routinely reached before and during trial are entered into begrudgingly or not at all. Usually other motions—as well as the rule 11 motion—must be decided by a judge because counsel can no longer mutually resolve their differences regarding even routine matters. The losers are those who need the justice system but who can no longer afford it or whose day in court is delayed because the litigation process must be monitored step-by-step.

## IV.

The quest for a renaissance of professionalism in trial advocacy must been seen as an important ingredient in a nation's promise of equal justice under law. The *Dondi* court emphasized this premise when it said "that justice delayed and justice obtained at excessive cost, is often justice denied."[51]

Lawyers and clients alike must recognize that unprofessional advocacy—whether more akin to benign incivility or to outright obstruction—can close the courthouse doors as effectively as can an act of government. Unnecessary expenditures of time and money must be viewed in the proper perspective:

> In isolation, such expenditures may appear inconsequential. Considered in the proper context of numerous civil actions and frequent disputes, it is apparent that cooperation between opposing counsel is essential to the efficient operation of our justice system.[52]

Civility must not be regarded as a sign of weakness; the just judgment must be seen as flowing from truth and reason, not artifice or obstruction.

The legal profession is unique among the learned professions. In the wisdom of those who centuries ago gave us the common law, lawyers are at once colleagues and adversaries. Medical doctors, for

---

51. Dondi Props. Corp. v. Commerce Sav. & Loan Ass'n, 121 F.R.D. 284, 286 (N.D. Tex. 1988) (en banc) (footnote omitted).

52. *Id.* at 292.

*TEXAS TECH LAW REVIEW*          [Vol. 20:787

example, do not perform surgery in such a manner that one physician attempts to undermine the work of another. But lawyers advocate in a contentious arena for the vindication of a particular party, recognizing that the quest to obtain justice for one in fact preserves the rights of all. Attorneys must be ever mindful that when they advocate the causes of their clients they need not — indeed must not — rely upon unprofessional conduct of any sort. Our common law tradition does not require it, our ethical canons do not suggest it, and our system of justice cannot afford it.

The renaissance of professionalism in trial advocacy may not be accomplished by one lawyer or by one law class or by one bar association. But it is said that a journey of a thousand miles begins with the first step. So let us begin.

# T Y L A

## S P E C I A L   F E A T U R E

**Editor's Note:** *Professionalism is an important issue facing the legal profession. In an attempt to provide a forum of discussion about professionalism, the TYLA Bar Journal Committee asked the following individuals to write articles addressing the issue. Views addressed in these articles are those of the writers and should not be considered official policy of the State Bar of Texas.*

# PROFESSIONALISM: VIEWING THE JUSTICE SYSTEM AS A MACROCOSM

By Judge Sidney A. Fitzwater

The civil trial advocate committed to professionalism advances a dispute ■ to a merits resolution without engaging in conduct designed to promote delay and unnecessary costs. This lawyer homogenizes the obligation of zealous advocacy with principles of honesty and fair play to achieve a just result as efficiently and economically as possible. Litigation tactics commonly labeled "Rambo," "hardball," and "rude" are rejected by the lawyer committed to professional trial advocacy.

Why is it that many attorneys opt to act professionally, even when clients demand obstructionism and intentionally combatant adversaries appear to enjoy lucrative law practices? I am persuaded that at the core of professionalism is an understanding of the civil justice system that is broader than the cabined perspective afforded by one's own law practice. Attorneys committed to professionalism comprehend that the system is a macrocosm in which subparts composed of each advocate's conduct aggregate to influence the success or failure of the civil justice mechanism.

Young litigators all too often are deprived of the opportunity to conceptualize the legal profession in its proper relation to the justice system at large. Law schools do not teach professionalism in trial advocacy to the extent they should. Attorneys entering the practice of law often lack role models or experienced colleagues willing to fill the tutorial void. In the absence of more formalized education, time, and experience appear to be the primary sources for the young

lawyer's perspective on the importance of professionalism in civil advocacy. But the civil justice system cannot function at its intended optimum if young lawyers rely for their training in professionalism upon the lessons taught by time and experience alone. Each lawyer's perspective would be relegated to the vagaries of uneven tutorial modalities composed of dockets of several kinds and sizes, varied litigation experiences, and differing role models.

This unhappy circumstance plainly must be changed. New lawyers must not practice law guided only by short-sighted goals—please the partner or satisfy the client—even if born of good faith ignorance rather than callous disregard for the impact that truncated professional aspirations can have upon the administration of justice. Habits acquired early in one's career are difficult to break later. And even if they were not, younger lawyers increasingly undertake leading roles in litigation activities—such as pretrial discovery—in which much of the unprofessional conduct is found.

The United States District Court for the Northern District of Texas recognized in *Dondi Properties Corp. v. Commerce Savings & Loan Ass'n*,[1] that experienced lawyers may "have ceased to teach new lawyers the standards [of professionalism] to be observed."[2] So the court spoke directly to all lawyers, including younger litigators, establishing standards of conduct in civil litigation to promote professionalism in trial advocacy. The court understood that it would, by its reasoning and by the rules it prescribed,

at once assist in educating young lawyers and bypass any erroneous notions of civil trial advocacy imputed by experienced lawyers.

The first standard adopted in *Dondi* makes pellucid that civil trial lawyers are to view the justice system in a larger sense. While the lawyer's primary duty is to the client, *Dondi* requires that each lawyer "be ever conscious of the broader duty to the judicial system that serves both attorney and client."[3] The rationale for requiring this more comprehensive view, as well as for the other standards, is set forth throughout *Dondi*. Unnecessary contention and sharp practices between lawyers "is so pernicious that it threatens to delay the administration of justice and to place litigation beyond the financial reach of litigants."[4] "Scarce resources" must not be wasted "supervising matters that do not advance the resolution of the merits of a case."[5] When collateral skirmishes are viewed, not in isolation, but in the broader context of numerous civil actions and frequent disputes, it is clear that the efficient operation of the justice system depends upon cooperation between opposing counsel.[6]

The dual premises for promoting lawyer professionalism—reducing litigation costs and delay—are now known, as well as knowable, by younger attorneys. These reasons are sufficient of their own weight to persuade officers of the court "whose unswerving duty is to the public they serve and to the system of justice in which they practice"[7] to analyze the effect of

**EXHIBIT 26**

their individual conduct upon the justice system as a whole. But even a young lawyer committed to a broader view of the justice system may legitimately inquire how individual conduct should be analyzed in terms of the justice macrocosm. *Dondi* does not, of course, leave the young litigator adrift in a juridical sea, but prescribes 10 other standards[8] of conduct to inform the litigator's understanding of the relationship between discrete conduct and its aggregate effect. It is nevertheless useful to illustrate how application of the more general standard of professionalism can guide the young lawyer in ordering grist of the mill litigation conduct.

Assume that a lawyer representing a plaintiff is considering what claims to include in a complaint. Among the possible theories are those that lack independent merit, but due to their nature or sheer number may serve to increase the settlement value of a case. The costs of this practice should be obvious. The client's assessment of the value of the case may become skewed, thereby undermining the opportunity of all parties to engage in meaningful discussions to resolve the case short of expensive litigation. Discovery may become more protracted and complex, delaying the trial setting. Clients as well as lawyers on both sides may become frustrated by the resulting delay. Judges may be compelled to expend valuable resources assessing the viability of claims that should never have been brought. And if the already-burdened trial court is unable to eliminate any patently unmeritorious claims prior to trial, the parties and the justice system must incur the costs of trying claims that should not command the attention of litigants, jurors, and officers of the court.

The costs, of course, are not simply economic costs borne by the parties. There are significant systemic and social costs, as well. If a court must devote attention to unsupported claims, litigants with potentially meritorious claims are denied a forum. When a party is forced to expend resources defending claims that have no palpable merit, the defending party may grow distrustful of a system that allows such claims to be litigated. A system that in large measure depends upon popular acceptance of its authority cannot afford this social cost.

Assume, on the other hand, that the plaintiff's lawyer has prepared the case with forthright adherence to principles of professionalism and has



*Sidney A. Fitzwater has served as a United State District Judge for the Northern District of Texas in Dallas since 1986. From 1982 to 1986 he served as a state district judge. He is a 1976 graduate of Baylor Law School.*

carefully pruned any meritless claims from the lawsuit. An unprofessional defense lawyer may assert myriad inapposite defenses, interpose baseless counterclaims and motions, take unwarranted discovery, or employ combative and win-at-all-cost tactics. This conduct will likely stall litigation of the merits, engender satellite litigation on sanction questions, and increase the costs of litigating the case to the point that the plaintiff cannot afford to prosecute a meritorious claim or may obtain a remedy too attenuated in time to resemble the righting of a contemporaneous wrong.

All these tactics should be rejected on the basis of the lawyer's duty to the system of justice as a whole. And all are readily understood as unacceptable by lawyers who are genuinely "ever conscious of the broader duty to the judicial system" that *Dondi* commands.

Professionalism in civil trial advocacy is not merely desirable, it is an ineluctable ingredient in the administration of equal justice to all. *Dondi* provides a clear signal that all lawyers—including young lawyers—are expected to view their work as part of a macrocosm—the entire justice system. Young lawyers should expect no less from themselves.

1. 121 F.R.D. 284 (N.D. Tex. 1988) (en banc).
2. *Id.* at 286.
3. *Id.* at 287.
4. *Id.* at 286.
5. *Id.*
6. *Id.* at 292.
7. *Id.* at 288.
8. The *Dondi* standards are:

   (A) In fulfilling his or her primary duty to the client, a lawyer must be ever conscious of the broader duty to the judicial system that serves both attorney and client.

   (B) A lawyer owes, to the judiciary, candor, diligence, and utmost respect.

   (C) A lawyer owes, to opposing counsel, a duty of courtesy and cooperation, the observance of which is necessary for the efficient administration of our system of justice and the respect of the public it serves.

   (D) A lawyer unquestionably owes, to the administration of justice, the fundamental duties of personal dignity and professional integrity.

   (E) Lawyers should treat each other, the opposing party, the court, and members of the court staff with courtesy and civility and conduct themselves in a professional manner at all times.

   (F) A client has no right to demand that counsel abuse the opposite party or indulge in offensive conduct. A lawyer shall always treat adverse witnesses and suitors with fairness and due consideration.

   (G) In adversary proceedings, clients are litigants and though ill feeling may exist between clients, such ill feeling should not influence a lawyer's conduct, attitude, or demeanor towards opposing lawyers.

   (H) A lawyer should not use any form of discovery, or the scheduling of discovery, as a means of harassing opposing counsel or counsel's client.

   (I) Lawyers will be punctual in communications with others and in honoring scheduled appearances, and will recognize that neglect and tardiness are demeaning to the lawyer and to the judicial system.

   (J) If a fellow member of the Bar makes a just request for cooperation, or seeks scheduling accommodation, a lawyer will not arbitrarily or unreasonably withhold consent.

   (K) Effective advocacy does not require antagonistic or obnoxious behavior and members of the Bar will adhere to the higher standard of conduct which judges, lawyers, clients, and the public may rightfully expect.
121 F.R.D. at 287-88.

**27**

# NORTHERN DISTRICT OF TEXAS

### REPORT ON MOTIONS, BENCH TRIALS AND CIVIL CASES
### PENDING 03/31/03

| District Judges and Magistrate Judges | Cases Pending | Motions Pending | Bench Trials Submitted | Bankruptcy Appeals | Social Security Appeal Cases |
|---|---|---|---|---|---|
| **Magistrate Judges** | | | | | |
| McGlinchey, Alexander H. | 0 | 0 | 0 | 0 | 0 |
| Sanderson, William F. | 1 | 0 | 0 | 0 | 0 |
| Warnick, J. Q. Jr. | 0 | 0 | 0 | 0 | 0 |
| Averitte, Clinton E. | 0 | 0 | 0 | 0 | 0 |
| Boyle, Jane J. | 0 | 0 | 0 | 0 | 0 |
| Kaplan, Jeffrey A. | 0 | 0 | 0 | 0 | 0 |
| Bleil, Charles M. | 0 | 0 | 0 | 0 | 0 |
| Stickney, Paul D. | 1 | 0 | 0 | 0 | 0 |
| Koenig, Nancy M. | 0 | 0 | 0 | 0 | 0 |
| Lane, Philip R. | 0 | 0 | 0 | 0 | 0 |
| Roach, Robert K. | 0 | 0 | 0 | 0 | 0 |
| Weeks, John W. | 0 | 0 | 0 | 0 | 0 |
| **Subtotal** | **2** | **0** | **0** | **0** | **0** |
| **District Judges** | | | | | |
| Mahon, Eldon B. | 0 | 0 | 0 | 0 | 0 |
| Sanders, Barefoot | 2 | 2 | 0 | 1 | 0 |
| Robinson, Mary Lou | 6 | 11 | 0 | 0 | 0 |
| Buchmeyer, Jerry | 8 | 6 | 0 | 4 | 0 |
| Fish, A. Joe | 3 | 0 | 0 | 0 | 0 |
| Maloney, Robert B. | 1 | 12 | 0 | 0 | 0 |
| Fitzwater, Sidney A. | 2 | 0 | 0 | 0 | 0 |
| Cummings, Samuel Ray | 0 | 0 | 0 | 0 | 0 |
| McBryde, John H. | 1 | 1 | 0 | 0 | 0 |
| Solis, Jorge A. | 1 | 0 | 0 | 1 | 0 |
| Means, Terry | 4 | 7 | 0 | 3 | 0 |
| Lindsay, Sam A. | 18 | 24 | 0 | 3 | 0 |
| Lynn, Barbara M. G. | 10 | 0 | 0 | 0 | 0 |
| **Subtotal** | **58** | **63** | **0** | **12** | **0** |
| **District Total (All Judges)** | **56** | **63** | **0** | **12** | **0** |

Key:  CJ = Chief Judge, VJ = Visiting Judge, *Non-Integrated Case Management System.

## A. Joe Fish

Chief Judge; Texas, Northern
United States Courthouse; 15th Floor
1100 Commerce Street
Dallas, TX 75242
(214) 753-2310
Spouse: Betty; Children: Abigail, Stephen
Born 1942; appointed in 1983 by President Reagan

**Education**   Yale Univ., B.A., magna cum laude, 1965, LL.B., 1968

**Military Service**   S/Sgt., United States Army Reserve, 1968-74

**Private Practice**   McKenzie & Baer, Dallas, 1968-80

**Previous Judicial Positions**   District Judge, 95th District Court, 1980-81; Associate Justice, Texas Court of Appeals, Fifth District, 1981-83

**EXHIBIT 27**

**28**

# UNITED STATES DISTRICT COURT

## Northern District of Texas

Home | Directories | Rules | Court Records | Forms | Publications | Filing Info | Jury Info | Judges | Links | Employment | FAQ | About Us

## Judges - Senior District Judge Barefoot Sanders

Search: [____] GO

Fish | Robinson | Buchmeyer | Fitzwater | Cummings | McBryde | Solis
Means | Lindsay | Lynn | Godbey | Kinkeade | Sanders | Maloney

Biography | Requirements | Notable Case | General Information

Alt Dispute Booklet
Attorney's Handbook
CJRA Plan
Dondi Opinion
Federal Rules
Glossary of Legal Terms
Local Rules
Post Judgment Rate

### General Information

1100 Commerce Street
Room 1504
Dallas, Texas 75242-1003

Courtroom 1505

Chambers: 214-753-2375 / FAX: 214-753-2382
Judicial Assistant: Phyllis Macon
Courtroom Deputy: Ronnie Jacobson - 214-753-2166
Court Reporter: contact CRD

Case Letter Designation: (H)

| BIOGRAPHY | |
|---|---|
| **Birth:** | 1925 |
| **Year Service Began:** | 1979 |
| **Appointed by:** | President Jimmy Carter |
| **Education:** | University of Texas 1949 BA, University of Texas School of Law 1950 JD |
| **Legal Practice:** | Associate, Storey, Sanders et al, Dallas 1950 - 1952; Partner, Sanders, Lefkowitz & Green 1952 - 1961; Partner, Clark, West, Keller, Sanders & Butler 1969 - 1979 |
| **Military Service:** | U.S. Naval Reserve 1943 - 1946 |
| **Government:** | Member, Texas House of Representatives 1952 - 1958; U.S. Attorney Northern District of Texas 1961 - 1965; Assistant Deputy Attorney General 1965 - 1966; Assistant Attorney General 1966 - 1967; Legislative Counsel to the President 1967 - 1969 |
| **Current Memberships:** | American Bar Association, Dallas Bar Association, American Judicature Society, Dallas Bar Association, Dallas Bar Foundation, Federal Bar Association, State Bar of Texas, and Texas Bar Foundation |

**EXHIBIT 28**

lawyers try the case." "He has a good demeanor. He has no quirks." "He is a no-nonsense judge. Be prepared." "His demeanor is appropriate."

Some lawyers further commented that Maloney does not always move cases along swiftly. "He tends to let his cases languish. He takes a long time to rule on motions." "He is slow to get to trial."

Lawyers say Maloney does not strong-arm settlement. "There is no push." "He is average on settlement, he doesn't push." "He is not particularly pro-active on settlement." "He doesn't push settlement."

Plaintiffs' attorneys stated that Maloney is evenhanded in civil cases. "He is well known for giving both sides a fair trial." "You'll get a fair trial in his court."

Civil defense attorneys concur that Maloney is impartial. "He has no bias. He is fair. He is evenhanded." "There is no bias." "He has no bias I've seen."

Criminal defense attorneys say Maloney is fair, but can be harsh when sentencing. "He has no bias. He's pretty fair on sentencing." "He's on the harsh side when it comes to sentencing. He'll give you a good trial with every opportunity to win—but if you lose, you might as well get punished pretty good." "He isn't biased."

# Barefoot Sanders

Senior Judge; Texas, Northern
United States Courthouse; 15th Floor
1100 Commerce Street
Dallas, TX 75242
(214) 753-2375
Fax: (214) 753-2382
Spouse: Jan Sanders; Children: Judge Janet L. Sanders, Martha Crockett, Mary Sanders Korsan, Harold B. Sanders III
Born 1925; appointed in 1979 by President Carter

**Education**   Univ. of Texas, B.A., 1949; Univ. of Texas, J.D., 1950

**Military Service**   Lt. (j.g.), United States Naval Reserve, 1943-46

**Private Practice**   Clark, West, Keller, Sanders & Butler, 1969-79; Sanders, Lefkowitz & Green, 1952-61

**Government Positions**   Texas Legislature, 1952-58; United States Attorney, N.D. Tex., 1961-65; Assistant Deputy Attorney General, United States Department of Justice, 1965-66; Assistant Attorney General, Department of Justice, 1966-67; Legislative Counsel to the President of the United States, 1967-69; Judicial Conference of the United States, 1989-92; Judicial Panel on Multidistrict Litigation, 1992-00; Judicial Conference Committee to Review Circuit Council Conduct and Disability Orders, 2000-present

**Professional Associations**   A.B.A. (Chair, National Conference of Federal Trial Judges, 1988-89); American Judicature Society; Federal Bar Assn.; State Bar of Texas; Texas Bar Foundation; Dallas Bar Assn.; Dallas Bar Foundation

**Political Activities**   Democratic candidate for the United States Senate, 1972

**Noteworthy Rulings**   1981: Sanders took over a Dallas school desegregation case after Judge William Taylor

withdrew. Sanders ruled that the school board must find some way other than further busing to desegregate its schools. Sanders held that busing "is not a feasible remedy to the existing Constitutional violations." Sanders said he based his decision on the testimony of many witnesses who spoke on behalf of the Black Coalition. He said, "there is considerable difference of opinion among sizable segments of the minority citizenry of Dallas over the type of relief that should be ordered in this case." In 1984, Sanders substantially reduced 1976-ordered busing by requiring the school district to establish learning centers in minority neighborhoods. *Tasby v. Wright,* 585 F. Supp. 453 (N.D. Tex. 1984), *aff'd sub nom. Tasby v. Black Coalition to Maximize Education,* 771 F.2d 849 (5th Cir. 1985). In July 1994, Sanders declared the school district unitary subject to a three-year monitoring period. *Tasby v. Woolery,* 869 F. Supp. 454 (N.D. Tex. 1994).

1984: Sanders ordered the city of Dallas to create a fenced-in protest area within 350 feet of the delegates to the Republican Convention and to expand the protest area; Sanders said he was seeking to balance convention security needs with the protesters' rights to free speech. New York Times, Aug. 20, 1984.

1986: Sanders handled foreclosures on properties of the Hunt brothers. The brothers sought Chapter 11 protection for Placid Oil Co. in New Orleans, against Sanders's orders. They asserted that Sanders was unfair, but the Fifth Circuit upheld Sanders's requirement that suits by banks against the Hunts, and the Hunts's countersuits against the banks, be resolved in Dallas. *Hunt v. Bankers Trust Co.,* 799 F.2d 1060 (5th Cir. 1986).

1991: Sanders took away an important tool of the Justice Department's fight against pornography by rejecting the forfeiture of a multimillion dollar videotape store for the sale of two obscene videotapes out of 5700 titles. *United States v. California Publishers Liquidating Corp.,* 778 F. Supp. 1377 (N.D. Tex. 1991). On appeal, the Fifth Circuit affirmed the defendants' convictions but remanded for reconsideration of the forfeiture issue. *United States v. Investment Enterprises, Inc.,* 10 F.3d 263 (5th Cir. 1993), *reh'g en banc denied,* 16 F.3d 1217 (5th Cir. 1994).

1991: Sanders handled the litigation and settlement of two civil rights class action suits brought on behalf of the mentally ill and mentally retarded against the State of Texas. *Lelsz v. Kavanaugh,* 783 F. Supp. 286 (N.D. Tex. 1991), *aff'd,* 983 F.2d 1061 (5th Cir. 1993), *cert. denied,* 510 U.S. 906 (1993); *R.A.J. v. Jones,* Civ. No. 3-74-0394H.

1991: Sanders dismissed a suit alleging that the accounting firm Ernst & Young contributed to the failure of Dallas-based Western Savings Association by failing to disclose to the thrift's officers and directors that it was in poor financial condition. Sanders said there was no evidence that the thrift relied on the auditors' negligent work or that disclosure would have affected the actions of its officers and directors. The Fifth Circuit affirmed. Wall Street Journal, Oct. 2, 1991. *FDIC v. Ernst & Young,* 967 F.2d 166 (5th Cir. 1992), *reh'g en banc denied,* 976 F.2d 732 (5th Cir. 1992).

1999: Sanders held that the Texas statute prohibiting the unauthorized practice of law was violated by the sale and distribution of software that provides legal forms specific to the state and help features that offer legal information, and that applying the statute to bar the sales and distribution of the software would not violate the manufacturer's First Amendment free speech rights. After the Texas legislature amended state law to provide that the practice of law does not include design and distribution of software if the product states that it is not a substitute for the advice of an attorney, the Fifth Circuit vacated and remanded Sanders's decision.

**Almanac of the Federal Judiciary · Volume 1**
©2003 Aspen Publishers

*Unauthorized Practice of Law Committee v. Parsons Technology, Inc.,* 1999 U.S. Dist. LEXIS 813 (N.D. Tex. 1999), *vacated and remanded,* 179 F.3d 956 (5th Cir. 1999).

**Bar Association Evaluations**   Sanders received a 92% overall performance approval rating in a judicial evaluation poll conducted by the Dallas Bar Association in 2001.

**Lawyers' Evaluation**   Lawyers interviewed characterized Sanders as a model for all others. "He is an icon. He is an excellent judge—a great judge all the way around. He is superior and sets the standard by which all others are rated." "He's very highly regarded. He is excellent." "I've only met five or six in my lifetime that I would put in a category with Barefoot Sanders. He has excellent legal skills." "He is a good judge." "He is excellent." "His legal ability is high." "He is a real giant. He is an outstanding judge." "He is excellent."

Most lawyers described a good courtroom demeanor. "He shows consistency in excellence." "He is down-to-earth." "He is a bit easier-going than other judges. You need to be well-prepared. He has certain requirements, and you'll need to jump through all the hoops he expects, though he is not pushy." "He has commonsense." "He has an excellent temperament." "He runs his courtroom smoothly." "He is a very comfortable judge." "He has a good demeanor." "He has heard it all before." "He has a rough demeanor." "He has a little bit of a temper if you get on his bad side, but doesn't hold grudges." "He has become angry at having to put up with cases—he seems anxious to get it over with."

Sanders slightly pushes settlement and, according to lawyers, he can be very effective. "He pushes settlement." "He is very creative when it comes to creating an atmosphere conducive to settlement." "He will inquire about settlement and will take an interest. He likes to be kept updated on the status of settlement negotiations." "He inquires about settlement, but doesn't push." "There is no real push for settlement."

Plaintiffs' attorneys interviewed disagree as to whether Sanders has a defense bias. "Everybody's got a fair shake with him." "There is no bias." "There is a defendant bias, particularly in civil rights cases."

Civil defense attorneys similarly disagree as to whether Sanders is impartial. "There is no bias." "He is very well-respected by both sides of the docket." "He is not as liberal as his reputation." "He tends to favor the plaintiff a little—he is a liberal judge."

Criminal defense attorneys stated that Sanders is essentially evenhanded, but can be harsh on sentencing. "He is very fair. He treats everybody equally. Tough but fair on sentencing—he will listen to your arguments." "He is very fair." "He tends to favor the government. He is extremely tough on sentencing."

**Miscellany**   During Senate Judiciary Committee hearings in 1979, Sanders said there would be no conflict of interest in a case in which he was the judge and one of the parties was a major contributor to one of his political campaigns. "I would certainly bend over backwards if there were any possibility of that," he said. Sanders also said that he supported a bill that expanded the authority of United States Magistrate, because it would help clear case backlogs. Restricting or nearly abolishing the Supreme Court's obligatory jurisdiction "by putting nearly all of it on certiorari and knocking out appeal as a matter of right in certain situations" would also help, he said.

# BANKRUPTCY JUDGES

## Steven A. Felsenthal

Chief Bankruptcy Judge; Texas, Northern
1100 Commerce Street; Room 1254
Dallas, TX 75242-1496
(214) 753-2040
Appointed in 1987

**Professional Associations**   Judicial Resources Committee of the Judicial Conference of the United States, 1991-97; Fifth Circuit Judicial Council Library Committee; John C. Ford Inn of Court; National Conference of Bankruptcy Judges

**Bar Association Evaluations**   Felsenthal received a 97% overall performance approval rating in a judicial evaluation poll conducted by the Dallas Bar Assn. in 2001.

**Noteworthy Rulings**   1990: Felsenthal ruled that loan borrowers who fraudulently obtained loans from now-failed savings associations are liable for their loans in bankruptcy court. In addition, Felsenthal also concluded that borrowers will also be held liable even if former loan officers knew of the fraud. Wall Street Journal, Apr. 17, 1990; *FDIC v. Smith,* 113 B.R. 297 (Bankr. N.D. Tex. 1990), *rev'd and remanded,* 133 B.R. 800 (N.D. Tex. 1991).

1990: Felsenthal denied permission for Southmark Corp. to pay a bonus of $960,000 to the corporation's former chairman. Southmark's directors approved the bonus as a reward for Arthur Weiss's success at steering the company through its Chapter 11 reorganization, but Felsenthal said that he could not "in good conscience" allow the payment, adding "The court is very skeptical about compensation packages from companies that are able to pay only a fraction of their debts." Wall Street Journal, Sept. 13, 1990.

1991: Felsenthal declined to issue a preliminary injunction prohibiting the Internal Revenue Service from garnishing a debtor's civil service annuity. The debtor, who had filed for Chapter 13 reorganization, had included payment of pre- and post-petition taxes in her payment plan, which had been approved by the court. Felsenthal concluded that confirmation of the debtor's Chapter 13 plan terminated an automatic stay under 11 U.S.C. § 362(a)(3), which prohibits "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate." *In re Lambright,* 125 B.R. 733 (Bankr. N.D. Tex. 1991).

1994: Felsenthal denied a motion by a debtor's former wife to have his homestead seized and sold to satisfy non-dischargeable family support obligations. Felsenthal agreed with the debtor, who maintained that his former wife could not use the Bankruptcy Code to preempt a Texas law exempting his homestead from execution on a judgment, even one for family support. The debtor had purchased his house for $750,000 in 1984 and then, in 1987, filed a Chapter 11 petition with his current wife. "[T]he Texas homestead ceased to be property of the bankruptcy estate when the claim of exemption became effective," Felsenthal explained. "The trustee could not use or sell the property." Felsenthal noted that the debtor "concedes that he could sell the house, pay the expenses of sale, pay his family support obligations in full and still have over $180,000 cash to invest in a house for himself and his present wife. Nevertheless, Texas law permits him to shield the entire $500,000 value of the unencumbered house." *In re Davis,*

**29**



# Congress Confirms 16 Judges

The Senate confirmed 16 federal judgeship nominees days before beginning its Memorial Day recess. This brings the total of Article III judgeship confirmations for this session to 23, seven in the appeal courts and 16 in the district courts.

On the day following the latest confirmations, the Senate Judiciary Committee met to consider still more nominations, holding hearings on four nominees. As of June 1, there were 35 pending nominations, with 66 vacancies.

Congress has yet to consider, however, the Federal Judgeship Act, S. 1145, introduced nearly a year ago by Senator Patrick Leahy (D-VT). No federal judgeship bill has been passed since 1990, although authorization for nine Article III judgeships was included in the consolidated spending bill for fiscal year 2000. Subsequently, a revised judgeship bill was sent to Congress to reflect that action, and also to withdraw a request for one temporary judgeship. In total, 11 appellate and 48 district judgeships are requested.

Every two years, the Judicial Conference submits its recommendations to Congress for additional federal judgeships, following its biennial judgeship survey of needs. Judicial Conference recommendations are based on a court's assessment of its need for additional judgeships, the caseload per judgeship, and other local factors having an impact on a court's judgeship needs. Since the last judgeship bill was passed, appeals filings in the federal courts have increased about 27 percent and the number of civil and criminal cases filed in the district courts increased more than 20 percent.

# Judicial Panel On Multidistrict Litigation Reorganized

In its first reorganization since 1992, the Judicial Panel on Multidistrict Litigation has added four new appointees, while four current members will step down effective June 1. A new chair will head the panel effective December 1. In a letter to Panel members, Chief Justice William H. Rehnquist noted the importance of the Panel to the effective operation of the federal Judiciary and described the new system under which appointments to the Panel will be for a term of seven years, and new appointments will be staggered. Rehnquist also told Panel members that, "The mission of the Judicial Panel on Multidistrict Litigation has been carried out with distinction under your leadership for the past decade." He said the advantage of the reorganization would be that continuity is assured, "while constantly replenishing the membership with one new appointment annually, thus broadening participation."



*At the last hearing before reorganization, the members of the Judicial Panel On Multidistrict Litigation were, seated left to right, Judge William B. Enright (S.D. Calif.), Panel Chair Judge John Nangle (E.D. Mo.), Judge Clarence A. Brimmer (D. Wyo.); and standing, left to right: Judge Louis Bechtle (E. D. Pa.), Judge John F. Grady (N.D. Ill.), Judge Barefoot Sanders (N.D. Tex.), and Judge John Keenan (S.D. N.Y.)*

Among the new appointments, Judge Wm.

**EXHIBIT 29**

Terrell Hodges (M.D. Fla.) will serve a seven-year term; Judge Morey Sear (E.D. La.) will serve a six-year term; Chief Judge Julia Smith Gibbons (W.D. Tenn.) will serve a five-year term; and Judge Bruce M. Selya (1st Cir.) will serve a four-year term. Of the current Panel members, Judge John Keenan (S.D. N.Y.) will serve a three-year term, and Judge Louis Bechtle (E.D. Pa.) will serve a two-year term. The terms of the remaining Panel members, Judges Clarence A. Brimmer (D. Wyo.), William B. Enright (S.D. Calif.), John F. Grady (N.D. Ill.) and Barefoot Sanders (N.D. Tex.), who have served at least 7 ½ years, ended on June 1, 2000.

The chair of the Panel, Judge John Nangle (E.D. Mo.), will continue to serve until December 1, at which time Hodges will become chair. Rehnquist, in extending Nangle's term, noted the need for the chair's continued leadership as a statutory response is sought to the *Lexecon Inc. v. Milberg Weiss* decision during this Congress and to permit Nangle to orient Hodges as the new chair. Nangle has served as chair of the Panel since 1990.

Looking back on the years of his chairmanship, Nangle noted the Panel began by developing policies to handle large numbers of related cases. "For example, with the large number of asbestos cases," observed Nangle, "we took a different route from previous Panels and centralized the cases before Judge Charles Weiner in the Eastern District of Pennsylvania. It wasn't a perfect solution, but it was the only one available in the judicial system—and the only one that worked. It allowed Judge Weiner to move serious cases through the system and, at the same time, to keep companies solvent." Nangle and his fellow Panel members developed additional factors to consider in centralizing cases, including the national character of some cases, and the availability of courts with good judges and less crowded dockets. "In the past, cases would overload the courts in New York or California," said Nangle. "We changed that to make better use of our judicial resources around the country. We also identified judges who were experts in case-related areas." Nangle also credits staff for the Panel's ability to handle an increasing number of cases over the years. The staff hasn't grown over the last decade, and some members have tenures of well over 20 years. "You don't find many staff that loyal and capable," Nangle said.

The Judicial Panel on Multidistrict Litigation was created by legislation in 1968 following an effort to coordinate almost 2,000 related cases pending in 36 districts—and containing over 25,000 claims—alleging a nationwide antitrust conspiracy among electrical equipment manufacturers. A national consensus evolved that the Panel was needed to streamline adjudication of related complex cases filed in multiple districts. According to statute, seven judges serve on the Panel, which presently meets every other month.

 Previous Next 》

**30**

6/6/03 FTWTHST 5                                                                    Page 1
6/6/03 Ft. Worth Star-Telegram 5
2003 WL 57057953

The Fort Worth Star-Telegram
(c) Copyright 2003, The Fort Worth Star-Telegram. All Rights Reserved.

Friday, June 6, 2003

B

**School** desegregation order lifted
By Eva-Marie Ayala
Star-Telegram Dallas Bureau


A federal judge ended the desegregation order against the Dallas
**school** district Thursday, releasing the district from the court
supervision that had controlled much of its decision-making for the past
33 years.
In his ruling, **Judge** Barefoot **Sanders** found no evidence to warrant
keeping the long-standing desegregation order.


Sanders wrote that, although the district seemed to lack
determination in complying with the order in the past, that is no longer
the case.


"In short, the DISD is a good urban **school** district -- better than is
generally recognized -- and is steadily improving," Sanders wrote.


The order stemmed from a 1970 lawsuit filed by Sam Tasby, a parent,
and called for the district to comply with a 1954 Supreme Court decision
outlawing segregated **schools**.


Superintendent Mike Moses said Thursday that he is pleased with the
ruling, but some worried that it would mean the end of certain **school**
programs.


Moses said the district would no longer need court approval of many
decisions.


"But I don't think this really releases us from a burden," Moses
said. "If anything, I think it increases upon us our responsibility to
operate a **school** district that is fair and is equitable for all
students."


Trustee Lew Blackburn said he is disappointed by the ruling and fears
that funding for programs created by the order -- such as magnet
programs, early childhood education centers and bilingual education --

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

**EXHIBIT 30**

6/6/03 FTWTHST 5
6/6/03 Ft. Worth Star-Telegram 5
2003 WL 57057953

Page 2

would be adversely affected.

"Funding for all of our **schools** that have benefited from the order will be changed," he said. "It will take the board to ensure what we built up will stay up."

Moses and **school** board President Hollis Brashear, who testified that the order should remain, said they are committed to a list of covenants the board promised to abide by if released from the order.

"The community needs to know that this ruling today does not mean that there will be a dismantling of programs in this district," said Brashear, who added that the community should support the ruling.

Moses said the district promised the court not to dismantle any programs for three years. He said the district plans to keep successful programs, but as time goes by, performance will be the basis for budgeting decisions.

In his ruling, Sanders wrote that he would be "gravely concerned" if the district departed significantly from the covenants during the next three years. The judge cited a federal rule that could allow the case to be reopened if the district's testimony concerning the covenants were misrepresented.

Ed Cloutman, who represents the plaintiffs, said his clients have made great progress in changing the district. But he said the community must hold the district accountable.

"I think parents and citizens alike should be ever vigilant with their **school** board and **school** administration to make sure they're delivering all they can and not fall back into the ways of previous administration," he said.

In 1994, Sanders declared the district desegregated but said it needed more time to make improvements. Four years later, he said additional work was needed to address some bilingual-education and **magnet-school** problems.

During hearings this spring, **school** lawyers said the district had made major gains since Moses' arrival in 2001.

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

6/6/03 FTWTHST 5
6/6/03 Ft. Worth Star-Telegram 5
2003 WL 57057953

But critics testified that a gap in test scores between Anglo and minority students remains, although it has narrowed. They wanted the order to continue for a five more years.


Staff Writer Mary Mckee Contributed to This Report.


---- INDEX REFERENCES ----

NEWS SUBJECT:        (Political/General News (GCAT); Education (GEDU))


REGION:              (North American Countries (NAMZ); United States (USA))


EDITION:        TARRANT ARLINGTON


OTHER INDEXING:    Education; Political/General News; United States; North American Countries; English language content; Education; United States; ENGL; EDU; US


Word Count: 587

6/6/03 FTWTHST 5

END OF DOCUMENT


Copr. © West 2003 No Claim to Orig. U.S. Govt. Works



# NOTICE

### PLEASE SEE OFFICIAL FILES
#### FOR

# MDL-1578
# PLEADING 1
# See pldg. for exhibits 1-22

*Michael J. Beck*

CLERK OF THE PANEL

October 2, 2003